DAVID A. NELSON, Circuit Judge.
This appeal presents a question on which there has been a sharp conflict between our circuit and others: whether the members of a state medical licensing board, when sued individually for damages in connection with the board’s suspension or revocation of a physician’s license, are protected by quasi-judicial immunity.
Relying on our decision in Manion v. Michigan Bd. of Medicine, 765 F.2d 590 (6th Cir.1985), the district court answered the question in the negative. A majority of the three-judge panel that initially heard this phase of the case on appeal concluded that although Manion probably could not be distinguished, neither could it be reconciled with earlier Sixth Circuit decisions holding that such immunity attached to members of a state bar grievance committee who performed judicial-like functions in recommending disbarment of a lawyer and to social workers who performed prosecutorial-like functions in removing children from allegedly unsuitable homes. Ginger v. Circuit Court, 372 F.2d 621 (6th Cir.), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967); Kurzawa v. Mueller, 732 F.2d 1456 (6th Cir.1984). See also Salyer v. Patrick, 874 F.2d 374 (6th Cir.1989) (quasi-judicial immunity protects social workers performing prosecutorial-like functions in filing child abuse petitions). The panel majority elected to follow the Ginger line of authority, and the judgment of the district court was reversed. One judge dissented on the grounds that our circuit precedents were not in direct conflict and that Manion, even if decided incorrectly, was therefore controlling.[1]
*271 All of the judges agreeing that the panel decision was in conflict with Manion, the court subsequently voted to rehear the instant case en banc. The parties filed supplemental briefs, and oral argument was held before the full court. The court has now concluded that on the facts of this particular case, the better view is that the members of the medical licensing board are protected by quasi-judicial immunity, a form of immunity also known as “absolute immunity.” We shall therefore reverse the judgment of the district court, overruling Manion to the extent of the inconsistency.
I
Much of the factual and procedural background of the case is set forth in an earlier opinion reported as Watts v. Burkhart, 854 F.2d 839 (6th Cir.1988). A somewhat truncated statement of the case will suffice for present purposes.
The plaintiff, Bobby Watts, is a medical doctor licensed to practice in Tennessee. His practice is focused on weight-loss programs in which he prescribes a drug known as Preludin.[2]
On October 21, 1985, the Division of Health Related Boards of the Tennessee Department of Health and Environment brought charges of malpractice and unprofessional conduct against Dr. Watts before the Tennessee Board of Medical Examiners. The notice of charges stated, among other things, that Dr. Watts had prescribed controlled substances in such quantities that the public health, safety and welfare “imperatively require[d] emergency action” under Tenn.Code Ann. § 4-5-320(c). This provision, which is part of Tennessee’s Administrative Procedures Act, authorizes summary suspension of a physician’s license pending the outcome of revocation proceedings.
Dr. Watts was advised of a hearing to be held before the Board of Medical Examiners on October 30, 1985. At that time, the notice of charges said, the board would be asked to suspend the doctor’s medical license summarily, pending a final determination as to whether the license should be revoked or other discipline should be imposed. The notice advised Dr. Watts of his right to be represented by legal counsel.
Dr. Watts appeared at the suspension hearing without counsel. At the conclusion of the hearing the board obtained Dr. Watts’ signature on a printed form embodying a “voluntary” surrender of a certificate evidencing that the United States Drug Enforcement Administration had authorized him to handle controlled substances. The doctor alleges that he signed the surrender form only because the board told him that his state license would be suspended if he did not do so.
Through counsel, Dr. Watts subsequently advised the board of his desire to withdraw the surrender of the DEA certificate. The division then asked the board for a new hearing on the motion for summary suspension.
Dr. Watts filed the instant lawsuit in federal district court before such a hearing could be convened. By agreement, he was allowed to continue using his DEA certificate.
Named as defendants in the complaint, which was brought under 42 U.S.C. § 1983, were the Division of Health Related Boards and the five physicians who comprise the Board of Medical Examiners. The division itself was eventually dismissed on sovereign immunity grounds, and the complaint was amended to make it clear that the board members were being sued in their individual capacities.
The action was predicated on alleged violations of Dr. Watts’ due process and equal protection rights. As to equal protection, the complaint alleged that “as a result of several well-publicized actions involving black physicians, [Dr. Watts, who is black,] was not afforded a presumption of inno *272 cence by the Defendant Board Members, and [ ] he was treated in a manner different from similarly situated physicians.” The due process claim rested on allegations that, the proceedings before the board were defective because,' among other things, the charges had not been stated with sufficient specificity, no-proper record was made at the hearing, witnesses were allowed to testify “off the record” and not under oath, and the board acted arbitrarily and capriciously in presuming Dr. Watts to be guilty and in coercing the surrender of his DEA certificate. The complaint sought not only injunctive relief, but compensatory and punitive damages approaching $2 million.
The district court dismissed the action against the defendant board members pursuant to Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), concluding that adequate remedies were available under state law. In the decision reported at 854 F.2d 839, this court reversed the dismissal. The panel was unanimous in the view that it was error to dismiss the equal protection claim, and a majority of the panel concluded- that the dismissal of the due process claim constituted error as well.
On remand, the defendants moved for dismissal on the ground that they were entitled to absolute immunity. This defense had not been raised previously. The district court denied the motion on the strength of Manion v. Michigan Bd. of Medicine, 765 F.2d 590, supra, and the present appeal followed. We are asked only to rule on the merits of the defense, and not to decide whether its assertion was timely.
II
In the leading case of Bradley v. Fisher, 80 U.S. (13 Wall.) 385, 20 L.Ed. 646 (1872), the Supreme Court applied the doctrine of judicial immunity to sustain the dismissal of a damage action brought against a judge who had ordered the disbarment of a lawyer without first according the lawyer an opportunity to be heard. Disbarment is a judicial act, the Court decided, even when performed in an “erroneous manner” — and without “clear absence of all jurisdiction over the subject-matter,” judges “are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.” 80 U.S. (13 Wall.) at 351-52. This continues to be an accurate statement of the law. Stump v. Sparkman, 435 U.S. 349, 355-57, 98 S.Ct. 1099, 1104-05, 55 L.Ed.2d 331 (1978).
The same sort of absolute immunity that applies to judges in the performance of judicial acts applies as well to prosecutors in the performance of their official functions. Yaselli v. Goff, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), aff'g, 12 F.2d 396 (2d Cir.1926); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). See Butz v. Economou, 438 U.S. 478, 508-11, 98 S.Ct. 2894, 2911-13, 57 L.Ed.2d 895 (1978), for a full exposition of the development of the modern absolute immunity doctrine as applied to judges and prosecutors.
In Ginger v. Circuit Court, 372 F.2d 621, supra, our court held that absolute immunity from liability for damages resulting from the disbarment of a lawyer applied not only to judges, but to the members of a state bar grievance committee that had recommended revocation of the plaintiffs license to practice law. Similar results have been reached by other courts; see Clulow v. Oklahoma, 700 F.2d 1291, 1298 (10th Cir.1983); Simons v. Bellinger, 643 F.2d 774 (D.C.Cir.1980); Mayes v. Honn, 542 F.2d 822, 824 (10th Cir.1976) (dictum); Verner v. Colorado, 533 F.Supp. 1109, 1115 (D.Colo.1982), aff'd, 716 F.2d 1352 (10th Cir.1983), cert. denied, 466 U.S. 960, 104 S.Ct. 2175, 80 L.Ed.2d 558 (1984).
In Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, supra, the Supreme Court decided that absolute immunity could be extended to non-judges for actions taken in suspending the plaintiffs business license. The Secretary of Agriculture and various officials in his department had been sued under 42 U.S.C. § 1983 for having' acted unconstitutionally in proceedings to revoke or suspend the plaintiffs license as a commodity futures commission merchant. “Al *273 though a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations,” the Court declared,[3] the absolute immunity enjoyed by judges and prosecutors with respect to judicial proceedings applies also to executive branch officials who institute quasi-judicial proceedings conducted under the safeguards of the Administrative Procedure Act: “We think that adjudication within a federal administrative agency shares enough of the characteristic's of the judicial process that those who participate in such adjudication should also be [absolutely] immune from suits for damages.” Id. at 508, 512-13, 98 S.Ct. at 2911, 2913-14 (emphasis supplied).
The immunity of participants in the judicial process stems not from the “location” of the judicial process in one branch of government or another, the Butz Court said, but from the “characteristics” of the process. Id. at 512, 98 S.Ct. at 2913. One of these characteristics is that the controversies with which the process deals are often “intense,” and the loser, given an opportunity to do so, will frequently charge the participants in the process with unconstitutional animus; “[ajbsolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.” Id. “Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation.” Burns v. Reed, — U.S. —, —, 111 S.Ct. 1934, 1943, 114 L.Ed.2d 547 (1991) (emphasis in the original).
Because the role of a modern federal hearing examiner is “functionally comparable” to that of a judge, Butz, 438 U.S. at 513, 98 S.Ct. at 2914, and in light of safeguards such as those provided by the Administrative Procedure Act, the Butz Court reached the following conclusion:
“[T]he risk of an unconstitutional act by one presiding at an agency hearing -is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts.” Id. at 514, 98 S.Ct. at 2915 (emphasis supplied).
Earlier in its opinion the Butz Court indicated that unless Congress should direct otherwise, it would be wrong to distinguish between state officials and federal officials in deciding on immunity from liability for damages under § 1983. Id. at 496-500, 98 S.Ct. at 2905-07.[4] It would seem to follow, therefore, that state officials subject to restraints comparable to those imposed by the Administrative Procedure Act and performing adjudicatory functions in resolving potentially heated controversies are entitled to absolute immunity from damages liability for their judicial acts.
At least two of our sister circuits have reached precisely this conclusion in *274 § 1983 actions brought against members of state medical boards for allegedly violating the-Constitution in suspending , or revoking a doctor’s license to practice medicine. See Horwitz v. State Bd. of Medical Examiners, 822 F.2d 1508 (10th Cir.), cert. denied, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987) (absolute immunity applied where the defendant board members suspended the plaintiff doctor’s license); Bettencourt v. Bd. of Registration in Medicine, 904 F.2d 772 (1st Cir.1990) (absolute immunity applied where the defendant board members revoked the plaintiff doctor’s license).
But in Manion v. Michigan Bd. of Medicine, 765 F.2d 590, supra, this court held that although medical licensing functions performed by the Michigan Board of Medicine were adjudicative in nature, and although hearings before the board could be conducted pursuant to the Michigan Administrative Procedures Act, public policy had not been shown to require that members of the board be accorded absolute immunity in determining who should be allowed to practice medicine in Michigan. Id. at 595-96. Noting that there are cases in other jurisdictions to the contrary, we concluded that “the qualified immunity rule rather than the absolute immunity rule is best applied in situations such as this.” Id. at 596.
Where the function in question is clearly adjudicative or prosecutorial in nature, other courts have generally taken the position that public policy requires application of the rule of absolute immunity. “[Ajgain and again,” as the Supreme Court said in Briscoe, the Court has recognized that in situations involving performance of a function that is judicial in character, “the alternative of limiting the official’s immunity would disserve the broader public interest.” 460 U.S. at 345, 103 S.Ct. at 1120. The Briscoe Court then quoted these words from Judge Learned Hand’s opinion in Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):
“As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.”
What Learned Hand said immediately before this passage is also pertinent:
“It does indeed go without saying that an official, who is in fact guilty of using his powers , to vent his spleen upon others, or for any other personal motive not connected with the public, good, should . not escape liability for the injuries he may so cause; and, if it were possible in , practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it' is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as' the güilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith.” Id.
As applied to the case at bar, Hand’s logic teaches that it would be monstrous to let the defendant board members escape liability if they were in fact motivated by racial considerations and if it were possible in practice to target only defendants who have acted from evil motives, as opposed to defendants who may have made an honest mistake. But except for Manion, the case law in this circuit and elsewhere is very clear: public policy requires absolute immunity for officials performing quasi-prosecutorial or quasi-judicial functions, at least where protections such as those provided by the Administrative Procedure Act are in place, because of the likelihood that exposure to “the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the un *275 flinching discharge of their duties." Gregoire, 177 F.2d at 581.
The public policy embodied in the doctrine of absolute immunity is not one that the courts have invented only recently. As the Supreme Court demonstrated in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, supra, the doctrine of absolute immunity for persons performing a judicial function has roots stretching far back into the common law. “Few doctrines were more solidly established at common law — ” Pierson v. Ray, 386 U.S. 547, 553-54, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). See Burns v. Reed, — U.S. at —, 111 S.Ct. at 1941, quoting the observation of Lord Mansfield in King v. Skinner, Lofft 55, 56, 98 A.E.R. 529, 530 (K.B.1772), that “neither party, witness, counsel, jury, or Judge can be put to answer, civilly or criminally, for words spoken in office.” The Bums Court went on to note that “[tjhis immunity extended to ‘any hearing before a tribunal which perform[ed] a judicial function.’ W. Prosser, Law of Torts § 94, pp. 826-827 (1941)....” Id.
Because the doctrine of absolute immunity for members of tribunals performing a judicial function was well established in 1871, the year in which Congress passed the statute now codified at 42 U.S.C. § 1983, the Supreme Court has consistently acted on the assumption that had Congress wished to abolish the doctrine, it would, have said so. See Pierson v. Ray, 386 U.S. at 554-55, 87 S.Ct. at 1218. . And although the Supreme Court has “diverged to a substantial degree from the historical standards” in dealing with qualified immunity, the Court has eschewed “freewheeling policy choices” in cases involving absolute immunity; “[i]n cases involving absolute immunity we adhere to [historical analogy, based on the existence of common-law rules in 1871], granting immunity to the extent consistent with historical practice.” Wyatt v. Cole, — U.S. —, —, 112 S.Ct. 1827, 1835, 118 L.Ed.2d 504 (1992) (Kennedy, J., concurring).[5]
Although the quasi-judicial function exercised by the defendants in the case at bar appears comparable to functions that have long been accorded absolute immunity at common law, Butz may suggest that absolute immunity would not be available if the Tennessee Board of Medical Examiners were not subject to restraints and safeguards comparable to those built into the archetypal judicial process. We turn to this matter next.
The Tennessee Board of Medical Examiners, unlike its counterparts in some other states, is composed entirely of professionals. Under Tenn.Code Ann. § 63-6-101, every one of the five members of the board must be a duly licensed physician with at least six years of experience in the practice of medicine and/or surgery. Each member must have been graduated from a medical school with a curriculum as high as that of the medical department of the University of Tennessee. Although the members of the board are appointed by the governor, they do not serve at the governor’s pleasure; at the time in question here, Tenn. Code Ann. § 63-6-102 provided for staggered four-year terms. (The term was subsequently increased to five years.) Under Tenn.Code Ann. § 63-6-216, the board must conduct all disciplinary proceedings in accordance with the Uniform Administrative Procedures Act, as compiled in Tenn. Code Ann. §§ 4-5-101 et seq.
The Tennessee Administrative Procedures Act provides procedural safeguards for contested cases comparable to those provided by the corresponding federal law, 5 U.S.C. §§ 554 et seq. All of these safeguards are applicable to medical license revocation proceedings, and. Tenn.Code Ann. § 4-5-320(c) scrupulously protects the fundamental right of notice and an opportunity to be heard:
“No revocation, suspension, or withdrawal of any license is lawful unless, *276 prior to the. institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license.”
Summary suspension is authorized, in the next sentence of § 4-5-320(c), only upon a specific finding of imperative need:
“If the agency finds that public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other actions.”
Summary suspension is nothing more than a temporary expedient, and it may not be used to obviate the need for revocation proceedings in which the full panoply of Administrative Procedures Act protections applies. The final sentence of § 4-5-320(c) makes it mandatory that “[t]hese proceedings ... be promptly instituted and determined.” (Emphasis supplied.) Any danger of improper use of the board’s summary powers is further mitigated by Tenn.Code Ann. § 4-5-322(a)(l), which provides that “preliminary, procedural or intermediate agency action ... is immediately reviewable [by the Chancery Court] if review of the final agency decision would not provide an adequate remedy.” We were told at oral argument, moreover, that the Chancery Court can go outside the administrative record in considering claims of bias, racial prejudice, and the like.
The presence of these procedural safeguards, and the independent status of the members of the Tennessee Board of Medical Examiners, clearly distinguish this case from Cleavinger v. Saxner, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), where the Supreme Court declined to extend absolute immunity to Bureau of Prisons employees serving as members of a prison disciplinary committee. The disciplinary committee members lacked the independence that characterizes federal or state judges, the Cleavinger Court observed, and their function was not “a ‘classic’ adjudicatory one____” Id. at 203, 106 S.Ct. at 502.
“They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. [Citation omitted.] It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.” Id. at 204, 106 S.Ct. at 502.
Unlike a traditional parole board, the Cleavinger Court continued, the prison staff members on the disciplinary committee were not “impartial professionals]” serving on “a ‘neutral and detached’ hearing body.” Id. (citations omitted). “And in the penalty context,” the Court added, “the parole board is constitutionally required to provide greater due process protection than is the institution discipline committee.” Id.
In the case at bar, of course, we are dealing with independent professionals who are required by law to provide substantial due process protection. The members of the Board of Medical Examiners do not have to worry about their decisions being reviewed by the governor who appointed them, and the board members are at least as independent, one would assume, as state judges who must periodically stand for reelection.
Dr. Watts complains that because the board is comprised entirely of physicians, there is a “risk of self interest economic regulation.” Such a risk was more clearly evident in Simons v. Bellinger, 643 F.2d 774 (D.C.Cir.1980), however, where the defendants were lawyers on the District of Columbia Court of Appeals Committee on Unauthorized Practice of Law, and the plaintiffs — New York attorneys, not licensed in the District of Columbia, who practiced before federal courts and agen *277 cies — could not even hope for the “professional courtesy” that might have been a risk had local lawyers been involved. The United States Court of Appeals for the District of Columbia Circuit held that a grant of immunity was warranted, and that “the only appropriate immunity is one which is absolute.” Id. at 778.
Dr. Watts argues that the four-page notice of charges with which he was served prior to his suspension hearing was imper-missibly “vague and ambiguous.” These charges were -brought not by the defendants, however, but by counsel for the Department of Health and Environment’s.Division of Health Related Boards. It was the division, similarly, that conducted the investigation that led up to the issuance of the charges.[6] Even if the division did not have sovereign immunity as an arm of the state, and even if its personnel did not have quasi-prosecutorial immunity, the immunity of the defendant board members could not turn on the adequacy of the division’s investigation or on the precision with which the division drafted the charges. The immunity of the defendant board members turns on the function that they themselves were performing — and that function is directly comparable to the function performed by a judge in deciding whether to issue a temporary restraining order or preliminary injunction.
Dr. Watts lists no fewer than 14 procedural irregularities by which the suspension hearing was supposedly tainted. Many of the alleged irregularities — the failure to have an administrative law judge preside, for example — probably reflect the fact that this was a summary suspension proceeding and not a full-scale revocation proceeding. Be that as it may, however, there can be absolutely no question of the board’s jurisdiction to conduct the hearing — and as long as a judicial officer has jurisdiction over the subject matter before him, he “is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors.” Stump v. Sparkman, 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978).
It is true, to be sure, that the board had no jurisdiction to suspend the certificate of registration issued to Dr. Watts by the United States Drug Enforcement Administration. But the board had the power not only to try to settle the controversy, but also to suspend the doctor’s right to practice any form of medicine. In giving Dr. Watts a choice between “voluntary” surrender of,his DEA certificate and suspension of his medical license, the board was performing a quasi-judicial act designed, on its face, to protect the public on a matter clearly within the board’s competence.
The board’s act in coercing surrender of the DEA certificate was not without precedent, See, for example, Vakas v. Rodriquez, 728 F.2d 1293 (10th Cir.), cert. denied, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), where a disciplinary panel of the Kansas Board of Healing Arts recommended that the plaintiff's license to practice medicine be revoked unless he relinquished his DEA registration for a period of one year. The Court of Appeals for the Tenth Circuit had no difficulty in deciding that the members of the board enjoyed absolute immunity from a lawsuit challenging the constitutionality of their actions, because they were performing a quasi-judicial function and because there was no “clear absence of all jurisdiction.” Id. at 1297, quoting Stump, 435 U.S. 349, 357, 98 S.Ct. 1099, 1105.
Bettencourt v. Bd. of Registration in Medicine, 904 F.2d 772, supra, arose out of the actual revocation of the plaintiff’s license to practice medicine. Speaking through Chief Judge Levin Campbell, the First Circuit Court of Appeals said, in Bet-tencourt, that proper analysis involved answering three questions:
*278 “First, does a Board member, like a judge, perform a traditional ‘adjudicatory’ function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member,- like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect a physician’s constitutional rights?” Id. at 783, citing Butz, 438 U.S. 478, 510-13, 98 S.Ct. 2894, 2912-14, and other cases.
Each of these questions was answered in the affirmative in Bettencourt. Citing our opinion in Manion and the Tenth Circuit opinion in Horwitz v. State Bd. of Medical Examiners, 822 F.2d 1508, supra, the First Circuit held that medical board members function in adjudicatory roles. The court went on to say that “the act of revoking a physician’s license ... is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity .apparent.” Id. at 783. And finally, under the statutory scheme that existed in Massachusetts, “enough safeguards exist to ‘enhance the reliability of information and the impartiality of the deci-sionmaking process____’” Id., quoting Butz, 438 U.S. at 512, 98 S.Ct. at 2914. Tennessee’s statutory scheme is clearly comparable to that of Massachusetts in this respect.
The Bettencourt decision acknowledged our denial of absolute immunity in Manion, and expressed agreement with our statement that “[ojfficials who seek absolute immunity must squarely shoulder the burden of showing that public policy demands an exemption of that scope.” Bettencourt, 904 F.2d at 784, n. 15, quoting Manion, 765 F.2d at 596. The First Circuit concluded, however, that the defendant medical board members could and did meet this burden “by showing that (1) their positions are akin to that of judges; (2) the potential for vexatious lawsuits is great; and (3) enough safeguards exist to protect a physician’s constitutional rights.” 904 F.2d at 784 n. 15. The defendants in the case at bar have met their burden in exactly the same way.
To the extent that the Manion decision is inconsistent with the views here expressed, the decision is overruled. The judgment of the district court in this case is REVERSED, and the case is REMANDED with instructions to dismiss the complaint.

. See Court Policies, United States Court of Appeals for the Sixth Circuit, § 10.2 (June 12, 1991):
“Reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous *271 panel. Court en banc consideration is required to overrule a published opinion of this court.”

. The 1991 edition of the Physicians' Desk Reference says that the pharmacologic activity of this drug is similar to that of the prototype drugs of its class, the amphetamines, which are used in the management of obesity.

. For an explanation of qualified immunity — a form of immunity available only where the facts are found to be such that the defendant’s conduct would appear objectively reasonable to a similarly situated third party — see Butz, 438 U.S. at 506-08, 98 S.Ct. at 2910-12; Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Harlow v. Fitzgerald, 457 U.S. 800, 817-19, 102 S.Ct. 2727, 2737-39, 73 L.Ed.2d 396 (1982). See also Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Defendants who are entitled to absolute immunity are often entitled to qualified immunity as well, but absolute immunity has the advantage, from the defendant’s standpoint, of better enabling the defendant to avoid the burdens and uncertainties of extensive discovery and either a trial or full-blown summary judgment proceedings.

. See Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), applying absolute immunity to a local police officer sued under § 1983 for giving perjured testimony in a judicial proceeding. Just as “§ 1983 does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their respective duties on the other,” protection of the judicial process was held to require that absolute immunity be given to governmental participants in that process. Id. at 335, 103 S.Ct. at 1115 etseq. In reaching this conclusion the Court cited precedents involving both state and federal officials; no distinction was drawn between them.

. It is conceivable, of course, that the common law doctrine of absolute immunity would have developed differently if our modern summary judgment practice had been in existence for hundreds of years. But the Supreme Court has never suggested that the current availability of summary judgment means that we should stop granting absolute immunity to the extent consistent with historical practice.

. Dr. Watts’ supplemental brief says that under Tennessee’s system one of the members of the board is designated a "consultant” to the division, in which capacity the board member instructs and guides the division staff in the investigation of complaints against physicians. Dr. Watts made no such allegation in his complaint, however, and the affidavit cited in his brief does not indicate that any of the defendants in this case did in fact instruct or guide the staff of the division in its investigation of Dr. Watts.