Edward MANDELBAUM and Cooperative Trading Services, Incorporated, Plaintiffs,

v.

NEW YORK MERCANTILE EX-CHANGE, R. Patrick Thompson, Ronald G. Oppenheimer, James Morrissey, Stuart Smith, and Does 1 Through 10 Inclusive, Defendants.

No. 93 Civ. 8302 (AGS).

United States District Court, S.D. New York.

Aug. 1, 1995.

Scott M. Brenner, New York City, for plaintiffs.

Pollack & Kaminsky by Martin I. Kaminsky, Edward T. McDermott and Justin Y.K. Chu, New York City, for defendants.

*Opinion & Order*

SCHWARTZ, District Judge.

## BACKGROUND

Plaintiff Edward Mandelbaum is a former member of the New York Mercantile Exchange ("NYMEX"). Complaint, ¶¶ 3, 14 and 85. He sold his NYMEX seat in April 1993. Complaint ¶ 85. Mandelbaum is also the owner of co-plaintiff Cooperative Trading Services, Incorporated ("CTS"), Complaint ¶¶ 4 and 5, which was a floor brokerage company engaged in trading on NYMEX until early 1993.

NYMEX is the largest commodities exchange in New York and the third largest in the United States, providing a contract market for energy and metals futures and options. Complaint, ¶¶ 6 and 7. NYMEX is the principal forum on which petroleum products are traded in the world. Defendants Thompson, Oppenheimer, Morrissey and Smith are officers and employees of NYMEX, and are actively involved in its day-to-day operations [¶¶ 9–12].

NYMEX and the individual defendants have a quasi-governmental role in the regulation of trading on NYMEX. As such, they conduct investigations, and they institute and prosecute disciplinary proceedings to punish wrongdoing by NYMEX members, pursuant to a regulatory structure created by Congress in the Commodity Exchange Act and overseen by the Commodity Futures Trading

Commission [Complaint ¶ 7, see also § 8c of the Commodity Exchange Act ("CEA") ]. Under that structure, Congress delegated disciplinary responsibilities to NYMEX as a self-regulatory organization, and to its officials (such as the individual defendants) who perform those duties on behalf of NYMEX. *Id.*

Plaintiffs contend that NYMEX and the individual defendants abused their regulatory authority in furtherance of an alleged conspiracy to coerce Mandelbaum to sell his NYMEX seat. Complaint, ¶¶ 21, 178, 187. More precisely plaintiffs allege that defendants initiated an improper disciplinary proceeding against Mandelbaum, harassed and threatened Mandelbaum with other disciplinary proceedings, and instituted an allegedly baseless disciplinary proceeding against CTS' "main executing broker", Peter Walshak. Complaint, ¶ 21.

Plaintiffs claim that NYMEX improperly imposed a summary $5,000 fine upon Mandelbaum to discipline him for conduct in the crude oil trading ring on October 21, 1998 Complaint, ¶¶ 22, 23, 26 and 31–34. Mandelbaum successfully appealed that fine to the CFTC, which vacated the fine in 1992. Complaint, ¶¶ 65, 66, 76. Thus, plaintiffs acknowledge in the Complaint that:

> Mandelbaum was finally afforded due process and as a result of same, he was exonerated on all the fabricated and serious allegations against him.

During the Mandelbaum disciplinary proceeding, plaintiffs contend, Mr. Smith allegedly signed false affidavits, Complaint ¶¶ 49, 63, which he and Mr. Oppenheimer allegedly mailed to the CFTC, Complaint ¶¶ 46, 63. In addition, Mr. Morrissey (who is the Director of the Trade Practices Unit in NYMEX's Compliance Department) supposedly harassed Mandelbaum with interviews and threats of other disciplinary actions with respect to Mandelbaum's trading activities, Complaint ¶ 100; and Mr. Thompson (NYMEX's President) is alleged to have threatened to "bury [Mandelbaum] with legal costs" and to appeal the CFTC decision to the United States Court of Appeals for the Second Circuit. Complaint ¶ 99. As noted, however, the CFTC exonerated Mandelbaum, Complaint ¶¶ 65, 66, 76; no further disciplinary proceedings were brought against plaintiff, Complaint ¶ 100;, and NYMEX did not seek a further appeal.

Plaintiffs contend that NYMEX further brought its disciplinary machinery to bear against them by instituting and prosecuting a disciplinary proceeding against Walshak in 1991 and 1992 with respect to Walshak's trading in the crude oil ring on September 17, 1991, Complaint, ¶¶ 122 *et seq.*[1] The Walshak disciplinary proceeding resulted in a conviction of Walshak, after a full hearing before his peers, for "engaging in an act of bad faith" and "conduct inconsistent with just and equitable principle [sic] of trade." Complaint ¶¶ 148–49.

Plaintiffs' other factual allegations and claims arise out of or are corollaries to the disciplinary proceedings against Mandelbaum and Walshak.

Plaintiffs claim that Mandelbaum was harmed by the foregoing conduct, inasmuch as it allegedly compelled him to sell his NYMEX seat in April 1993. Complaint, ¶¶ 21, 150 and 184. In addition, plaintiffs contend that CTS was forced to close down its trading operation [¶ 175]. As a result, plaintiffs seek $20 million (trebled to $60 million) in damages [pp. 80–84].

### Procedural History of this Action

Plaintiffs filed the Complaint in this action on December 3, 1993, alleging that NYMEX and the four NYMEX staff official, and certain other unnamed NYMEX staff members, engaged in wrongdoing in connection with the disciplinary actions prosecuted against plaintiffs. The Complaint asserts claims under RICO, the Commodity Exchange Act, and common law. Defendants move to dismiss the complaint on various grounds, including that defendants are absolutely immune from liability for their roles in initiating, prosecuting, and adjudicating the disciplinary proceedings relating to plaintiffs.

---

1. Walshak was an employee of CTS, not Mandelbaum; and Mandelbaum himself was not a party in the Walshak proceeding. [Complaint ¶ 158].

Plaintiff moves to amend the Complaint, seeking *inter alia* to add factual allegations based upon the convictions, by the CFTC, of defendant McGoldrick and others for major NYMEX regulatory violations. *See* Affidavit of Edward Mandelbaum, ¶ 19; Plaintiff's Mem. of Law in Support of Motion to Amend the Complaint, at 3–4.

For the reasons set forth below, defendants' motion to dismiss the Complaint is granted, and plaintiff's motion to amend the Complaint is denied.

## DISCUSSION

■ As noted, defendants premise their motion to dismiss in part on the doctrine of absolute immunity.[2] In analyzing whether actions of government officials should be placed within the common-law tradition of absolute immunity, the Supreme Court has developed a "functional approach." *Buckley v. Fitzsimmons*, —— U.S. ——, ——, 113 S.Ct. 2606, 2612, 125 L.Ed.2d 209 (1993). This inquiry is centered on "the nature of the function performed, not the identity of the actor who performed it,"[3] and, significantly for this action, "focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." *Buckley*, —— U.S. at ——, 113 S.Ct. at 2615; *see also, Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir.1987) ("The entitlement of a government official to absolute immunity, protecting him from liability from suit and from any scrutiny of the motive for and reasonableness of his official actions, depends on the function he performs.")

■ Upon examining constitutional, congressional, and historical guidance on the issue, courts have extended absolute immunity to persons who are or are "functionally comparable" to judges, prosecutors, witnesses and other "participants in the judicial process." *Johnson v. Kegans*, 870 F.2d 992, 995–96 (5th Cir.1989); *see also Stump v.*

*Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Butz v. Economou*, 438 U.S. 478, 510–513, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978), the Supreme Court articulated the three part test to be used in determining need to afford absolute immunity to a government official, namely, that official's conduct qualifies for protection if:

a) the official's functions share the characteristics of the judicial process;

b) the official's activities are likely to result in recriminatory lawsuits by disappointed participants; and

c) sufficient safeguards exist in the regulatory framework to control unconstitutional conduct.

Under the facts confronting the Court in *Butz*, absolute immunity was extended to Department of Agriculture officials who were found to perform the function of judges and prosecutors. Specifically, the Court found that hearing examiners, administrative law judges, and agency prosecuting officers satisfied the foregoing criteria inasmuch as they: (1) acted as judges and prosecutors albeit in an administrative rather than judicial forum; (2) would likely be the targets of recriminatory lawsuits by targets of prosecution; and (3) the governing statutes and regulations, including the Administrative Procedure Act, provided adequate safeguards to control unconstitutional conduct, so that an abuse of office was unlikely to go uncorrected.

In *Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc.*, 757 F.2d 676 (5th Cir.1985), absolute immunity was extended to private individuals and organizations who work in quasi-governmental capacities. More precisely, the Fifth Circuit found that:

Although the NASD possesses no sovereign power, we conclude that, under the rationale of *Butz*, it requires absolute im-

---

2. On a motion to dismiss, we assume the allegations set forth in the Complaint to be true, draw all inferences in favor of plaintiff, and construe the pleadings in the light most favorable to the plaintiff. *Underpinning & Foundation Constructors, Inc. v. Chase Manhattan Bank*, 46 N.Y.2d 459, 414 N.Y.S.2d 298, 386 N.E.2d 1319 (1979);

*Kersul v. Skulls Angels Inc.*, 130 Misc.2d 345, 495 N.Y.S.2d 886, 888 (Sup.Ct.1985).

3. *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988).

munity from civil liability for its actions connected with the disciplining of its members.

*Id.*, at 692. Further, inasmuch as NASD disciplinary committee members "acted as prosecutors or adjudicators when disciplining [plaintiff]" by undertaking to "decide[ ] which charges would be brought against [plaintiff], a traditional prosecutorial function, and then adjudicated [plaintiff's] guilt, which clearly is functionally equivalent to a judge," they were entitled to "absolute immunity from civil liability for their actions taken within the outer scope of their disciplinary duties." *Id.*, at 689, 691. Finally, the court noted that:

> For any actions the [NASD] staff has taken in a prosecutorial role, however, its members would be entitled to receive absolute immunity based on the same analysis as set out for the [disciplinary committee] members.

*Id.*, at 693.

In applying the other prongs of the *Butz* test within the NASD disciplinary context, the court noted that officers of self-regulatory organizations are likely targets for recriminatory lawsuits. *Id.*, at 689. With respect to the final *Butz* criterion, the court similarly concluded that the regulatory system governing NASD provided adequate safeguards against abuse of office. In particular, the court responded to plaintiff's objection that the disciplinary committee of the NASD was made up of his competitors, and thus possessed an incentive to engage in a witch hunt against him.

> The gravamen of Austin's objections to the NASD procedures is that private competitors in the industry adjudicate their case. Because the DBCC members serve without pay, they may continue their securities investment work during their tenure on the committee. Austin contends these members are not isolated from outside influence and therefore should not receive absolute immunity. Austin's contention reaches the heart of the self-regulatory system established by Congress, because in any such system, the regulators will a fortiori be competitors in the industry. Congress expressly created this system, however, so that the membership could apply specialized business expertise in the regulation of this complex industry.

*Id.*, at 690. The court concluded that a grant of absolute immunity to competitors who fulfill prosecutorial and adjudicative functions in the regulation of the securities industry was warranted in view of the oversight authority exercised by the SEC with respect to the NASD, the power of the SEC to discipline NASD officers who violate NASD rules or abuse their positions, and the presence of three levels of appellate review as of right, including an appeal to the United States Circuit Court of Appeals. In making its findings, the court also noted analogous decisions involving bar association disciplinary committees and arbitrators, *id.*, at 690–691 (citing cases), reasoning that just as bar committee members act as "surrogates for judges ... in the same fashion, NASD disciplinary officers serve as surrogates for the SEC and should receive the same immunity their principals possess." *Id.*, at 691, citing *Trama v. New York Stock Exchange*, Fed. Sec.L.Rptr. [1979 Transfer Binder] ¶ 96,748 at p. 94,919, 1978 WL 1141 (S.D.N.Y.1978) (holding that, for purposes of absolute immunity analysis, NYSE is an arm of the SEC).

■ *Austin* and its progeny [4] mandate dismissal of this action. Application of the *Butz* test to the factual allegations of both the Complaint and the proposed Amended Complaint reveals that all of the actions alleged to

---

4. *E.g., Bettencourt v. Bd of Reg. in Medicine,* 904 F.2d 772 (1st Cir.1990) (extending absolute immunity to medical review board and its staff for conduct relating to disciplinary proceedings); *Forman v. Ours,* 804 F.Supp. 864 (E.D.La.1992) (holding bar association's disciplinary board officials immune for actions taken in connection with disciplinary proceedings). The principles enunciated in *Austin* have also been interpreted to extend absolute immunity even in circumstances in which a plaintiff alleges an "ongoing conspiracy" to deprive plaintiff of his or her property or rights. *Bettencourt, supra,* 904 F.2d at 785 n. 16; *Dorman v. Higgins, supra,* 821 F.2d at 139.

> ([S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity.).

have been undertaken by defendants in the disciplining of Mandelbaum are protected by absolute immunity.

First, despite plaintiff's protests to the contrary, it is clear that the disciplinary proceedings initiated against Mandelbaum are judicial in nature, and that the functions within that process performed by the defendants "share characteristics of the judicial process." Although the initial fine levied against Mandelbaum occurred pursuant to a summary proceeding, that proceeding nonetheless constituted a disciplinary proceeding of the type addressed in *Austin, Bettencourt,* and other instances in which absolute immunity has been extended to the actions of self-regulatory organizations. As in *Austin,* the proceeding was conducted pursuant to Congressionally prescribed and delegated authority and rules explicitly approved by the CFTC (by means of the Commodity Exchange Act). The disciplinary proceedings were also characterized by the kind of multistage administrative and judicial review that courts have found dispositive on this issue. Targets of such disciplinary proceedings have the right to counsel at all stages, along with an opportunity to make written submissions at each level of appeal. The process itself includes a NYMEX review of the summary action before the Floor Committee (Mandelbaum made a written submission at this stage), and the opportunity for review by the CFTC, the government agency that oversees NYMEX (Mandelbaum made a further submission to the CFTC). Finally, where, unlike here, the CFTC fails to vacate NYMEX's sanction, the target of the disciplinary action may seek judicial review by the United States Circuit Court of Appeals, pursuant to 7 U.S.C. § 21(i), and, ultimately, by the Supreme Court. As noted, the presence of a right to counsel and opportunities for review by independent authorities who have the power to correct the alleged wrongs of putatively immune officials has proven persuasive to courts as they determine whether to extend the doctrine of absolute immunity. *See, e.g., Austin, supra; Bettencourt, supra; Watts v. Burkhart,* 978 F.2d 269, 276 (6th Cir.1992); *United States v. Irving,* 684 F.2d 494, 497 (7th Cir.1982).[5] We similarly find them to suggest the appropriateness of immunizing the actions of defendants in this action.[6]

That Mandelbaum's initial disciplinary proceeding did not constitute a full blown hearing is of no moment. First, the procedural protections discussed above attached regardless of whether the target of the disciplinary proceeding was initially fined in the context of a hearing. Second, as a matter of public policy, to limit the application of absolute immunity to matters in which a hearing or trial was held would severely hamper the administration of justice. Under plaintiff's formulation, immunity would fail to attach in any instance where a judicial officer resolved a matter at a preliminary stage, including, for example, by means of a summary judgment motion. Other courts have rejected such a truncated version of absolute immunity,[7] and we do so here.

The roles of defendants in the disciplinary proceedings against plaintiff clearly "share the characteristics of the judicial process," as that phrase has been defined by the courts in delineating the scope of absolute immunity. The individual defendants functioned as the advocates, witnesses, legal advisors, and investigators in the disciplinary proceedings at issue. *See Butz, supra,* 438 U.S. at 511–12, 98 S.Ct. at 2913–14 ("Absolute immunity is thus necessary to assure that judges, advo-

---

5. Notably, the Supreme Court declined to grant absolute immunity to a federal prison disciplinary committee where no such right to counsel or to independent oversight existed. *Cleavinger v. Saxner,* 474 U.S. 193, 206, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985); *see also Watts, supra,* 978 F.2d at 276 (distinguishing *Cleavinger* on the foregoing ground).

6. We observe that the appeals process in fact functioned exactly as contemplated in *Butz* and its progeny, inasmuch as the CFTC not only

vacated Mandelbaum's fine, but also redressed the procedural flaws in the NYMEX summary disciplinary proceeding that gave rise to the fine. CFTC Opinion and Order, Docket No. 89–E–2, at p. 6–10.

7. *See, e.g., Watts, supra,* 978 F.2d at 275, n. 5 ("the Supreme Court has never suggested that the current availability of summary judgment means that we should stop granting absolute immunity ...").

cates and witnesses can perform their respective functions without harassment or intimidation.") Under the above cited authorities, if the other prongs of the *Butz* test are satisfied, absolute immunity will clearly attach to defendants' prosecution of the disciplinary actions against Mandelbaum and Walshak. *E.g., Austin, supra; see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 530–531 (2d Cir.1993) (immunity attaches to "decisions as to whether or not to institute a prosecution, and if so on what charges"); *Forman v. Ours,* 804 F.Supp. 864, 868 (E.D.La.1992) (absolute immunity extends to employee of Bar disciplinary board who filed disciplinary charges and acted as assistant disciplinary counsel), *aff'd.* 996 F.2d 306 (5th Cir.1993). It would similarly cover the submission and transmittal (by Smith and Oppenheimer) of Smith's affidavits as a witness in the disciplinary proceeding against plaintiff,[8] and the conduct of defendants (e.g., Oppenheimer and Thompson) who acted as supervisors or legal advisors of those persons directly involved in the disciplinary proceedings. *Bettencourt, supra,* 904 F.2d at 784–85 (extending "quasi-judicial immunity" to staff members of medical disciplinary board who functioned as legal or other advisors in "establishing the disciplinary policy involved."). Finally, if the other prerequisites of *Butz* are met, absolute immunity would extend to the conduct of defendants, such as Mr. Morrissey, in conducting investigations and initiating disciplinary actions.[9] *Johnson, supra,* 870 F.2d at 996; *Ryan v. SEC,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,999 at 91,136) (W.D.Wash.1981) (granting absolute immunity to SEC staff disciplinary employees for their investigative activity).

The second prong of the *Butz* test—whether the officials' activities are likely to result in recriminatory lawsuits by disappointed participants—need not detain us long. We discuss this issue in the context of *Austin supra* at 678–679, and add only that precisely the same concerns mandate a similar finding

here. *See also, Butz, supra,* 438 U.S. at 515, 98 S.Ct. at 2915 (noting the tendency of individuals subject to discipline to vindicate themselves in the courts).

With respect to the third *Butz* factor, *viz.* whether sufficient safeguards exist in the regulatory framework to control unconstitutional conduct, we will not reiterate the substantial procedural protections afforded Mandelbaum as the subject of NYMEX disciplinary proceeding. *See, supra* at 679–680. We simply conclude that they clearly satisfy the concerns embodied by the third prong of the *Butz* test. As this Court noted, in *Trama, supra,* CCH Fed.Sec.L.Rep. ¶ 96,748 at p. 94,920, the public interest in the efficient operation of self-regulatory bodies such as the NYSE (in *Trama*) and NYMEX militates in favor of extending absolute immunity to the disciplinary officials of those organizations where the Congressional scheme for such disciplinary proceedings provides for internal procedural protections (e.g., right to counsel and to make submissions at each stage) and appeals to overseeing administrative authorities such as the SEC or CFTC, as well as to federal judicial fora:

> Absolute immunity is necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation. Furthermore, the safeguards which are built into the judicial process reduce the need for private damage actions as a means of controlling unconstitutional conduct. In the instant case, if the action of the Exchange had been adverse to plaintiff, plaintiff could have ultimately appealed the sanctions imposed to the Court of Appeals in order to test the constitutionality of the procedure utilized by defendants in assessing plaintiff's guilt or innocence."

As previously noted, the very outcome of this case—namely Mandelbaum's successful appeal to the CFTC—confirms the foregoing reasoning. Thus, defendants have satisfied the tripartite *Butz* test.

8. *Johnson v. Kegans,* 870 F.2d 992, 996 (5th Cir.1989); *Trama, supra* (CCH Fed.Sec.L.Rep. ¶ 96748 at 94,920, 1978 WL 1141) (witnesses are entitled to absolute immunity to protect them from "harassment and intimidation.").

9. In particular, Morrissey is alleged to have prepared a false investigatory report that initiated the Walshak disciplinary proceeding, Complaint ¶¶ 127, 137–38, 181(e), 182(c) and to have suppressed prior inconsistent statements of a witness as part of the prosecution team at the Walshak disciplinary hearing. *Id.,* at ¶ 181(f).

Plaintiff's objections to such a finding are unpersuasive. First, plaintiff emphasizes that defendants groundlessly and maliciously prosecuted him in order to cover up their own trading violations and otherwise to gain a competitive advantage on the trading floor. Mandelbaum Aff. ¶ 9 (describing allegation in both Complaint and proposed Amended Complaint). To the extent that plaintiff complains that his fate was determined within a regulatory system administered by his competitors, we have already discussed at length the *Austin* court's forceful rejection of this argument, *see supra* at 679, and will not further belabor the point here.[10]

Plaintiff also argues that defendants' conduct must have fallen outside the "outer scope" of their duties, and thus outside the ambit of any immunity defense, because the CFTC ultimately ruled that "NYMEX's summary action against Mandelbaum was not authorized under [NYMEX] Rule 8.27." Plaintiff's Br. at 4. This argument confuses the issues of whether an official possessed the authority—as vested in him by a government agency directly or indirectly through the intermediary of a self-regulatory organization such as NYMEX—to take certain action, and whether those actions constitute the kind of "function" that absolute immunity protects, and the analytically distinct issue of whether the official's actions are ultimately found to be correct. As we emphasized at the outset of our legal discussion of absolute immunity, the "functional approach" mandated by the Supreme Court in applying the doctrine of absolute immunity, focuses solely on the function performed by the official, and not on the correctness or even constitutionality of his or her actions. *See supra* at 678 (citing cases).

Here, the CFTC did not rule that the individual defendants lacked authority from NYMEX or its overseeing agency (i.e., the CFTC) to prosecute the fine against Mandelbaum and to defend it before the CFTC.[11]

Rather, the CFTC addressed NYMEX's summary fine procedure itself, vacating the fine against Mandelbaum because the process contained a "facial procedural flaw," namely, that it "failed to accord Mandelbaum the procedural protections" warranted by the violation of which he appeared to be accused. CFTC Opinion and Order, *supra*. The finding on appeal of such a procedural flaw, even if it is held to be of constitutional dimension, in no way strips the acting official of absolute immunity. *E.g., Watts, supra,* 978 F.2d at 277

> ([A]s long as a judicial officer has jurisdiction over the subject matter before him, he is absolutely immune from liability for his judicial acts, even if his exercise of authority is flawed by the commission of grave procedural errors.)

quoting *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978).

As a practical matter, the foregoing must obtain in order for absolute immunity to serve its function of permitting certain participants in judicial and quasi-judicial proceedings to play their roles without fear of recrimination. It will often be the case that the appellate process will reverse the decisions of lower tribunals, and in some instances—as here—will even determine that the proceedings in the lower tribunals (e.g., the summary proceeding against Mandelbaum pursuant to Rule 8.27) were themselves constitutionally deficient. In neither case, in order for the threat of recrimination not to chill officials in the performance of their regulatory function, should the courts deny absolute immunity because no official can know *ex ante* whether an action will be upheld, reversed, or reversed on constitutional grounds which implicate the very regulatory proceedings in which the official takes part. In each such circumstance, the Supreme Court and all lower courts have concluded, the official is entitled to absolute immunity so long as the *Butz* test is met.

---

**10.** We note, further, that the Supreme Court has found that no constitutional infirmity inheres in the members of the disciplinary arm of a self regulatory body performing both prosecutorial and adjudicative functions. *Austin, supra,* 757 F.2d at 689, citing *Withrow v. Larkin,* 421 U.S. 35, 56–57, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975).

**11.** The Complaint itself concedes that the individual defendants acted within the scope of their official capacities as the persons charged with initiating and prosecuting disciplinary proceedings on behalf of NYMEX.

## CONCLUSION

The pleadings in this action fundamentally misconceive the doctrine of absolute immunity. To bolster his claims, plaintiff bombards the court with factual allegations intended to illustrate that defendants are bad actors who have a history of engaging in nefarious acts (including abuse of their official positions within the NYMEX hierarchy), and plaintiff, in fact, seeks to amend the Complaint to reflect the subsequent CFTC convictions of certain defendants for significant NYMEX violations such as customer fraud and non-competitive trading. The factual allegations of the Complaint and Amended Complaint suggest that defendants have, in various ways, transgressed the legal and ethical norms of their profession, as well as perhaps having violated the public trust. As we have explained, however, such evidence is irrelevant to an analysis focusing on absolute immunity. Underlying the doctrine of absolute immunity is the policy decision that—in some instances—even bad actors must be protected in their performance of certain critical functions in our society, even at the expense of innocent victims of their abuse of office. Judge Learned Hand noted this dilemma in his seminal articulation of the basis for absolute immunity:

> It does indeed go without saying that an official who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well-founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties ... As is so often the case, the answer must be found in a balance between the two evils inevitable in either alternative. In this instance, it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). Thus, the legislatures and courts that have developed the doctrine of absolute immunity at all times recognized that it necessarily leads to troubling outcomes in some cases. *See, e.g., Forman, supra,* 804 F.Supp. at 866, n. 6 ("Implicit in the grant of absolute immunity is the recognition that the victim of an abuse of office may receive no recompense.") Here, it is clear that plaintiff—if the allegations set forth in the Complaint and proposed Amended Complaint are in fact true—suffered injuries flowing from defendants' actions as officers of NYMEX and/or participants in the NYMEX disciplinary proceedings against plaintiff. Nonetheless, we are constrained to find those actions immunized from liability. Accordingly, defendants' motion to dismiss the Complaint is granted. Because the proposed Amended Complaint contains no allegations that would alter the foregoing legal analysis, plaintiff's motion to amend the Complaint is denied.

SO ORDERED.