**John Houston SELLARS,
Plaintiff-Appellant,**

v.

**Raymond K. PROCUNIER et al.,
Defendant-Appellee.**

**No. 78–1120.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1980.

Decided April 9, 1981.

Rehearing and Rehearing En Banc
Denied July 6, 1981.

---

Before HUG and ALARCON, Circuit Judges, and BLUMENFELD *, District Judge.

ALARCON, Circuit Judge:

Petitioner John Houston Sellars ("Sellars") is an inmate of the California Mens Colony at San Luis Obispo. Respondent Procunier was chairman of the California Adult Authority.[1] Petitioner filed this action in district court, alleging that Procunier and other California Adult Authority officials had conspired to deprive him of rights under the first, fifth, sixth, eighth and fourteenth amendments by giving him a parole release date that requires him to serve an excessively long prison sentence. The district court granted summary judgment for the defendants on the ground that parole board members are absolutely immune to suit under the Civil Rights Act (42 U.S.C. § 1983)[2] for actions taken when processing parole applications.

The question before us is whether parole board members enjoy any immunity from civil rights suits brought against them by prisoners,[3] and if so, whether that immunity is absolute or qualified.[4]

John Houston Sellars, San Diego, Cal., for plaintiff-appellant.

Ramon De La Guardia, Sacramento, Cal., for defendant-appellee.

* Honorable M. Joseph Blumenfeld, United States District Judge, District of Connecticut, sitting by designation.

1. Under California's repealed Indeterminate Sentence Law, the California Adult Authority fixed the prison term and set the parole release date of every person sentenced by a trial court judge to state prison. Subsequent to the filing of this lawsuit, the State of California abolished the Adult Authority and replaced it with the Board of Prison Terms. Cal.Penal Code § 5078. California also repealed its Indeterminate Sentence Law and replaced it with a Determinate Sentence Law Cal.Penal Code § 1170 *et seq.*, under which prison terms are now set by trial judges pursuant to standards prescribed by the legislature.

2. 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. We leave to another day the question whether parole board officials enjoy any immunity from civil rights suits brought by persons injured by a dangerous parolee. *Cf. Grimm v. Arizona Bd. of Pardons & Paroles*, 115 Ariz. 260, 564 P.2d 1227 (1977) (parole board officials not immune from suits arising out of grossly negligent or reckless release of highly dangerous prisoners).

4. If an officer has absolute immunity from § 1983 suit, the trial court must dismiss any civil rights suit filed against that officer for actions taken within the scope of his or her

## FACTS

In 1973, petitioner was convicted of arson in Los Angeles County Superior Court. Petitioner's probation report indicates that within a 10-month period petitioner had ignited flammable liquid at the doors of four Los Angeles-area ballet studios. Petitioner's four children had been enrolled as students at the schools and he had apparently grown dissatisfied with the instruction they were receiving.

The sentencing judge characterized petitioner as "a grave danger to the community," and committed him to state prison on November 23, 1973. In 1975, an Adult Authority panel consisting of respondents Brown and Castro fixed petitioner's prison term at 11 years and set a parole date of December 21, 1983.

Petitioner then filed the instant suit, alleging that his release date was set in retaliation for his expression of political views and for his having filed habeas corpus and other petitions in various courts.

## INTRODUCTION

The language of 42 U.S.C. § 1983 is broad and sweeping; "*Every person*" who, under color of state law or custom, "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." [5] (emphasis added) "By its terms, § 1983 'creates a species of tort liability that on its face admits of no immunities.'" *Owen v. City of Independence*, 445 U.S. 622, 634, 100 S.Ct. 1398, 1407, 63 L.Ed.2d 673 (1980), quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). The congressional debates surrounding the passage of § 1 of the Civil Rights Act of 1871, 17 Stat. 13—the predecessor of § 1983—confirm the broad sweep of the statutory language. *See Owen v. City of Independence*, 100 S.Ct. at 1408; *Pierson v. Ray*, 386 U.S. 547, 561–63, 87 S.Ct. 1213, 1221–22, 18 L.Ed.2d 288 (1967) (Douglas, J., dissenting).

Despite the statutory language and the absence in the legislative history of any attempt to narrow that language, it is well established that certain classes of public officials enjoy at least some degree of immunity from suits under § 1983. The Supreme Court has utilized two approaches in determining whether a given public official is shielded in any degree from § 1983 liability. In some cases, the Supreme Court has held that some immunities survive § 1983 because at the time of § 1983's passage they were "so firmly rooted in the common law and [were] supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish [them.]'" *Owen v. City of Independence*, 100 S.Ct. at 1408, citing *Pierson v. Ray*, 386 U.S. at 555, 87 S.Ct. at 1218.

It is no longer the case, however, that immunity at common law in 1871 is the *sine qua non* for according public officials immunity under § 1983. In some circumstances, the Court has examined the "functional comparability" of the role of the official under scrutiny to the role of analogous officials who enjoyed immunity under common law in order to determine whether the modern-day official is entitled to any degree of immunity. *See, e. g., Butz v. Economou*, 438 U.S. 478, 512–17, 98 S.Ct. 2894, 2913–16, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman*, 424 U.S. at 423 n. 20, 96 S.Ct. at 991 n. 20; *Scheuer v. Rhodes*, 416 U.S. 232, 245–49, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). Immunity for parole board officials was apparently not well established at common law in 1871 when § 1983 was enacted.[6] The

---

official duty. Without inquiring into the merits by contrast, an officer who has qualified immunity can be liable under § 1983, but only for actions taken in bad faith, and not for actions that are merely negligent. *See Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976).

**5.** *See* note 2 *supra*.

**6.** Parole boards did not exist in 1871 when § 1983 was enacted. Prior to 1884, when Ohio became the first state to enact a statewide law governing the parole of adults by an administrative agency, paroles were doled out principally through the auspices of elected officials. *See generally* J. Bramer, Parole 19–43 (1926); G. I. Giardini, The Parole Process 5–16 (1959); G. Killinger, H. Kerper, P. Cromwell, Probation

question before us, therefore, is whether parole board officials enjoy an immunity from § 1983 liability under the test of "functional comparability."

### 1. Absolute and Qualified Immunity

#### a. Absolute Immunity

■ Of the officials who have been accorded absolute immunity, judges and those performing judge-like functions are the most analogous, in our view, to parole board officials.[7]

The cases granting absolute immunity to judges recognize that extraordinary reasons are required to justify the drastic step of barring the genuinely wronged individual from any redress against the wrongdoer. The Supreme Court has thus enunciated several policy reasons for striking the balance in these cases in favor of completely shielding the judge from suits under § 1983. The judge is in a unique posture in the

adversary system. His or her sole task is to make impartial decisions in vigorously contested actions, to "decide '[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings.' " Butz v. Economou, 438 U.S. at 509, 98 S.Ct. at 2912 quoting Bradley v. Fisher, 80 U.S. (13 Wall) 335, 348, 20 L.Ed. 646 (1872). The threat of constant litigation against the decision-maker instituted by disappointed litigants is apparent: it cannot be gainsaid that "[t]he loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus." Butz v. Economou, 438 U.S. at 512, 98 S.Ct. at 2913. Judges "should not have to fear that unsatisfied litigants may hound [them] with litigation charging malice or corruption." Pierson v. Ray, 386 U.S. at 554, 87 S.Ct. at 1217.

Thus, the proper functioning and indeed the very survival of any independent, dis-

---

& Parole in the Criminal Justice System, 17–33 (1976).

The concept of absolute judicial immunity dates back to at least 1607. See Floyd v. Barker, 77 Eng.Rep. 1305, 1307 (Star Chamber 1607). In 1810, the New York Court of Appeals first approved the doctrine in this country. Yates v. Lansing, 5 Johns. 282 (N.Y.1810). The Supreme Court first approved the doctrine in Bradley v. Fisher, 80 U.S. (13 Wall) 335, 20 L.Ed. 646 (1871). The concept of absolute immunity for non-court personnel exercising certain adjudicatory functions, however, did not arise until the early twentieth century. See Gray, Private Wrongs of Public Servants, 47 Calif.L.Rev. 303 (1959) [hereinafter cited as Gray]; Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209 (1963); Jennings, Tort Liability of Administrative Officers, 21 Minn.L.Rev. 263 (1937); McCormack & Kirkpatrick, Immunities of State Officials Under Section 1983, 8 Rutgers Camden L.J. 65 (1976); Casenote, Torts-Governmental Immunity-Absolute Versus Qualified Immunity for Public Officials Acting in Quasi-Judicial Capacities, 24 Wayne L.Rev. 1513 (1978). This extension of absolute immunity to non-court personnel under the rubric "quasi-judicial" immunity was described by some critics as a dangerous erosion of the common law. See, e. g., Gray, supra at 347–48.

**7.** Absolute immunity from § 1983 actions has been accorded to legislators, Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), judges, Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), prosecutors,

Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), and to those who perform judge-like or prosecutor-like functions within a federal agency, Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). Unlike other participants in the judicial process, defense counsel—even if court appointed and compensated—are not entitled to immunity. Ferri v. Ackerman, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979) (court appointed defense counsel sued for malpractice by indigent defendant not entitled to immunity). There is a marked difference between defense counsel's responsibilities and those of other officers of the court. The judge and the prosecutor's primary duty is to represent the interests of society as a whole. In their conduct of their official duties, they may adversely affect a wide variety of different individuals, each of whom may be a potential source of future litigation. Immunity is necessary to forestall an atmosphere of intimidation, and to insure that these officials have a maximum ability to deal fearlessly with the public. By contrast, defense counsel—whether appointed or privately retained—has a duty not to the public at large, but to serve the undivided interests of the defendant. "The fear that an unsuccessful defense of a criminal charge will lead to a malpractice claim does not conflict with performance of that function. If anything, it provides the same incentive for appointed and retained counsel to perform that function competently." Id. at 409.

pute-resolving system requires that the dread of subsequent lawsuits be prevented from becoming a factor in a judge's assessment of the merits of a case. Moreover, the judge's time which would be diverted to contesting such litigation could severely constrict the time available for the performance of his or her primary duties.[8] Absolute immunity, as the Supreme Court has acknowledged, leaves the genuinely wronged person without civil redress. However, broader societal concerns dictate that the balance be struck in favor of freeing judges from the constant fear of retaliatory suits. The alternative of qualified immunity, or no immunity at all, would disserve the public interest, because these officials would still be subject in some degree to vexatious litigation.

Nevertheless, the balance might not be struck in favor of absolute immunity were it not for the presence of safeguards built into the judicial process that tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct. *See Butz v. Economou*, 438 U.S. at 512, 98 S.Ct. at 2913.[9]

### b. Qualified Immunity

██ Qualified immunity has been accorded to certain state officials for decisions made in the good faith exercise of their official responsibilities.[10] It has been recognized that some degree of immunity is necessary in order to insulate these public servants from the possibility of vexatious litigation. In addition, it is accepted that these officials must take prompt action based on information provided to them by third parties. *Scheuer v. Rhodes*, 416 U.S. at 246, 94 S.Ct. at 1691; *Wood v. Strickland*, 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). For that reason, it is thought to be unfair to subject them to liability for good faith actions based on information that later turns out to be incorrect, or for good faith actions taken under the press of time.

The cases have held, however, that such public officials do not require the complete protection afforded to judicial officials. Implicit in these decisions is a recognition of the distinction between judicial and political decision-making. We expect and require the judge to be an impartial fact finder. Decision making by a public official, on the other hand, is above all a political process. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 228, 97 S.Ct. 1782, 1795, 52 L.Ed.2d 261 (1977). We do not expect impartiality; rather we expect that an elected official will balance the demands of his or her constituency in making a decision, and that the decision will to some extent reflect the pressures exerted on the official by those with an interest in the controversy. Political decision-making—unlike judicial decision-making—is not a

---

**8.** In 1869, Chief Justice Cockburn flailed the doctrine of judicial immunity in his dissent in *Dawkins v. Lord Paulet*, L.R.S.Q.B. 94 (1869). He wrote: "I am persuaded that the number of such actions [against judges] would be infinitely small and would be easily disposed of." *Id.* at 110. While the Chief Justice's argument may have had force in 1869, we do not believe it would be realistic in today's litigious era to discount the enormous burden and systemic costs that permitting civil rights suits against judges would impose on both the judge sued and on the federal courts themselves.

**9.** The insulation of the judge from political influence, the nature of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their as-

sertions will be contested by their adversaries in open court ... Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decision-making process, there is a less pressing need for individual suits to correct constitutional error. 438 U.S. at 512 (footnote omitted).

**10.** Qualified immunity has been accorded to state governors and state university officials, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), local school board members, *Wood v. Strickland*, 420 U.S. 555, 95 S.Ct. 992, 43 L.Ed.2d 214 (1978), superintendents of state hospitals, *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and to prison officials, *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

pristine process that must be protected at all cost from infection by fear of lawsuits. And although non-judicial executives do run some risk of civil right suits by citizens disgruntled for one reason or another, these suits cannot be expected with the same frequency as suits against judicial officers. Unlike judges or judge-like officials, state officials are not primarily adjudicators of disputes brought before them by advocates who legitimately expect impartial decisions. Because their posture is so different, the likelihood of suits by disappointed citizens is correspondingly lessened.

### 3. Parole Board Officials

The narrow question before us is whether parole board officials are entitled to any immunity from § 1983 suits, and if so, whether they are entitled to the absolute immunity accorded to judges, and persons performing judge-like roles within federal agencies,[11] or rather to the more limited good faith immunity accorded to other state executive officials.

Prior to *Scheuer v. Rhodes,*[12] it had been the rule in this circuit that members of a state parole board were absolutely immune from civil rights suits for actions taken when processing parole applications.[13] In *Johnson v. Reagan,* 524 F.2d 1123, 1124 (9th Cir. 1975), however, this court indicated that the rule of absolute immunity "may be obsolete" in light of the *Scheuer* decision.

While the Supreme Court has specifically left open the question of immunity under § 1983 for state parole board officers,[14] the federal courts that have considered the question subsequent to *Scheuer* have almost without exception continued to grant parole board members absolute immunity.[15]

---

**11.** In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court held that Agriculture Department hearing examiners, judicial officers and prosecuting attorneys were absolutely immune from any liability arising out of their adjudicatory or prosecutorial functions. The court of appeals had held that the relevant officials were only entitled to qualified immunity because they were not technically judges, but rather officials of the executive branch. The Court rejected such a narrow test:

> We think that the Court of Appeals placed undue emphasis on the fact that the officials sued here are—from an administrative perspective—employees of the Executive Branch. Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities. This point is underlined by the fact that prosecutors—themselves members of the Executive Branch—are also absolutely immune. "It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well." *Id.* at 511–12, 98 S.Ct. at 2913, quoting *Imbler v. Pachtman,* 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 991 n. 20, 47 L.Ed.2d 128 (1976).

**12.** In *Scheuer,* plaintiffs sued the Governor of Ohio and various other state executive officials for civil rights violations arising out of the deaths of plaintiffs' decedents during anti-war demonstrations at Kent State University. The Court of Appeals for the Sixth Circuit had held that defendants were absolutely immune from civil rights suits for all acts performed within the scope of their official duty. The Supreme Court reversed, holding that executive officers have only a qualified good faith immunity from civil rights suit. 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**13.** The rationale for this rule was expressed in *Silver v. Dickson,* 403 F.2d 642, 643 (9th Cir. 1968), *cert. denied,* 394 U.S. 990, 89 S.Ct. 1477, 22 L.Ed.2d 765 (1969): "[T]he members of the California Adult Authority ... are, while employed in the processing of applications for parole, performing quasi-judicial functions. They therefore have immunity from suits for damages under the Civil Rights Act, just as do other public employees engaged in the performance of quasi-judicial duties." *See also Keeton v. Procunier,* 468 F.2d 810 (9th Cir. 1972), *cert. denied,* 411 U.S. 987, 93 S.Ct. 2276, 36 L.Ed.2d 965 (1973); *Allison v. California Adult Authority,* 419 F.2d 822 (9th Cir. 1968); *Bennett v. California,* 406 F.2d 36 (9th Cir.), *cert. denied,* 394 U.S. 966, 89 S.Ct. 1320 (1969); *Villalobox v. Dickson,* 406 F.2d 835 (9th Cir. 1969).

**14.** *Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980) ("it is not necessary for us to decide any question concerning the immunity of state parole officials as a matter of federal law ...").

**15.** In *Bricker v. Michigan Parole Bd.,* 405 F.Supp. 1340, 1345 (E.D.Mich.1975), the court gave the following rationale for its decision to continue to grant parole board officers absolute immunity in light of *Scheuer:*

It has been suggested that following *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1978), every state agent sued under § 1983 is entitled to assert a qualified immunity from damage liability. *Procunier v. Navarette*, 434 U.S. at 568, 98 S.Ct. at 863 (Stevens J., dissenting opinion).

■ We need not decide that broader question here; under *Owen v. City of Independence*, it is clear that parole board officials enjoy some degree of immunity from § 1983 suits. In *Owen*, 100 S.Ct. at 1409, the Court held that "[w]here the immunity claimed by the defendant was well-established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act," Congress could not have meant to abolish that immunity by covert inclusion in the general language of § 1983. Administrative parole boards did not exist in the United States at the time § 1983 was enacted.[16] Prior to the establishment of these boards in various states, parole was primarily granted through the auspices of the state governor.[17] State governors and other executive officials enjoyed at common law an immunity from suit for acts done in good faith and without malice. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. As successors to state governors in making parole decisions, state parole board members should enjoy at the least the same immunity enjoyed by governors and other state executives under the common law.

■ The question remains whether parole board officials are entitled to the greater immunity afforded judges, and those performing judge-like roles within federal agencies. In our view, parole board officials are entitled to absolute immunity from suits by prisoners for actions taken when processing parole applications. The "functional comparability" test set forth most explicitly by the Supreme Court in *Butz v. Economou*, 438 U.S. at 512–17, 98 S.Ct. at 2913–16, requires that we look not just to the title of a state or federal official, or to his or her location within the bureaucratic

---

The court does not believe that the qualified immunity described in *Scheuer* and *Wood* [*Wood v. Strickland*, 420 U.S. 308, [94 S.Ct. 1683, 40 L.Ed.2d 90] (1975)] applies to Parole Board members because Parole Board members are not like executive government officials or school board members. In deciding to grant, deny, or revoke parole, they act in a quasi-judicial capacity, as an arm of the sentencing judge, just as prosecuting attorneys act in a quasi-judicial capacity in bringing criminal actions.

The considerations set forth by the Supreme Court in *Pierson v. Ray* are equally applicable to parole officers who are charged by law with the duty of granting or denying parole to prisoners in a manner which rehabilitates the prisoners and protects society at the same time. If Parole Board members were to be liable for damages because a prisoner disagrees with their decision, the threat of constant litigation would have an inhibiting effect upon the free and courageous exercise of their duties. (citations omitted).

*See also Douglas v. Muncy*, 570 F.2d 499 (4th Cir. 1978); *Pope v. Chew*, 521 F.2d 400 (4th Cir. 1975); *Cruz v. Skelton*, 502 F.2d 1101 (5th Cir. 1974); *Pate v. Alabama Bd. of Pardons & Paroles*, 409 F.Supp. 478 (M.D.Ala.1976); *Garvey v. Casson*, 423 F.Supp. 68 (D.Del.1976); *Fitzgerald v. Procunier*, 393 F.Supp. 335 (N.D. Cal.1975); *Franklin v. Shields*, 399 F.Supp. 309

(W.D.Va.1975), aff'd in part and reversed in part on other grounds, 569 F.2d 784 (4th Cir. 1977), *cert. denied*, 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978); *Reiff v. Pennsylvania*, 397 F.Supp. 345 (E.D.Pa.1975); *But see Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1979); *Gahagan v. Pennsylvania Bd. of Probation & Parole*, 444 F.Supp. 1326 (E.D.Pa.1978); *Joyce v. Gilligan*, 383 F.Supp. 1028 (N.D.Ohio 1974), aff'd mem., 510 F.2d 973 (6th Cir. 1975).

Whether Parole Board officers are entitled to absolute or only qualified immunity is an open question in the Eighth Circuit. *DeShields v. United States Parole Comm'n*, 593 F.2d 354, 356 (8th Cir. 1979); *Kelsey v. Minnesota*, 565 F.2d 503, 507 n. 4 (8th Cir. 1977). The Third Circuit has held that parole board members have absolute immunity from civil rights suits for the exercise of their "adjudicatory" functions, but only a qualified immunity for the exercise of "administrative functions." *Thompson v. Burke*, 556 F.2d 231, 237–40 (3rd Cir. 1977). *Cf. Jones v. Johnson*, 402 F.Supp. 992, 997 n. 4 (E.D.Pa.1975) (parole board officers have absolute immunity for "discretionary" functions only).

**16.** *See* note 6 *supra.*

**17.** *Id.*

superstructure, but to the official's function as well in determining the question of immunity. If an official's role is functionally equivalent to that of a judge, the official will be granted equivalent immunity.

We believe that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole. The daily task of both judges and parole board officials is the adjudication of specific cases or controversies. Their duty is often the same: to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by the parole board's decisions.

Judges enjoy absolute immunity from civil rights suits in order to keep the judicial decision-making process pristine. As noted earlier, we expect and require the judge to be an impartial fact finder. When he or she weighs the merits of a case, we do not want the scales to be tipped by fear of litigation. The adjudicatory process simply could not work if the adjudicator had to anticipate a possible lawsuit from every dissatisfied litigant.

■ We believe that the same degree of protection must be accorded to the decision-making process of parole board officials. Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials. Without this protection, there is the same danger that the decision-maker might not impartially adjudicate the often difficult cases that come before them. If parole board officials had to anticipate that each time they rejected a prisoner's application for parole, they would have to defend that decision in federal court, their already difficult task of balancing the risk involved in releasing a prisoner whose rehabilitation is uncertain

against the public's right to safety would become almost impossible. Furthermore, time spent in depositions and on the witness stand defending their actions would leave these overburdened public servants with even less time to perform their crucial tasks.

■ To be sure, absolute immunity for parole board officials does leave the genuinely wronged prisoner without civil redress against the official whose malicious or dishonest actions deprive the prisoner of liberty. But qualifying that immunity would disserve the broader public interest.

"As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought ... better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

*Imbler v. Pachtman*, 424 U.S. at 428, 96 S.Ct. at 994, quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

■ Finally, the fact that petitioner cannot bring a § 1983 suit against California Adult Authority officials does not leave him totally unprotected from capricious or arbitrary decisions. Under California law, a prisoner serving an indeterminate term is entitled to have the upper limits of the term at a length proportionate to the prisoner's individual culpability, and to challenge the length of the term by way of habeas corpus.[18] The prisoner has the right to apply for parole and to due consideration of the application,[19] and, if parole is denied, a right to a statement of reasons why[20] and to periodic reconsideration of the denial.[21] Once a parole date is set, the prisoner is entitled to routine reviews of his or her prison conduct to determine if the date

18. *See, In re Rodriquez*, 14 Cal.3d 639, 537 P.2d 384, 122 Cal.Rptr. 552 (1975).

19. *In re Schoengarth*, 66 Cal.2d 295, 425 P.2d 200, 57 Cal.Rptr. 600 (1967).

20. *In re Sturm*, 11 Cal.3d 258, 521 P.2d 97, 113 Cal.Rptr. 361 (1974).

21. *In re Minnis*, 7 Cal.3d 639, 498 P.2d 997, 102 Cal.Rptr. 749 (1972).

should be advanced.[22] We believe that such safeguards, especially the right to habeas corpus relief, are sufficient to protect petitioner's constitutional rights.

AFFIRMED.

BLUMENFELD, District Judge, concurring specially:

I concur in the result.

**22.** *In re Stanley*, 54 Cal.App.3d 1030, 126 Cal. Rptr. 524 (1976).