NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0388n.06

No. 16-4704

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 30, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BON-ING, INC.; JENNIE INGRAM CALLOWAY, | ) ) ) | |
| Plaintiffs- Appellants, | ) ) | |
| v. | ) ) | On Appeal from the United States District Court for the Southern |
| RICHARD HODGES; LANCE HIMES, | ) ) | District of Ohio |
| Defendants-Appellees. | ) ) | |

_____/

**Before: GUY, ROGERS, and KETHLEDGE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiffs Bon-Ing, Inc., and its sole shareholder Mrs. Jennie Ingram Calloway, alleged they were denied equal protection in violation of 42 U.S.C. § 1983 through actions taken against plaintiffs' skilled nursing facility by the Ohio Department of Health's Interim Director Lance Himes and his successor Director Richard Hodges. The district court granted the defendants' motion to dismiss, finding that Himes and Hodges were entitled to absolute immunity. Agreeing with the district court, we affirm.[1]

---

[1]Plaintiffs initially sued the defendants in their official capacities, but plaintiffs' amended complaint asserted the claims against them individually.

**I.**

Plaintiffs were long-time owners and operators of the Bon-Ing Care and Rehabilitation Center, a skilled nursing facility located in Ohio. The facility was licensed by the Ohio Department of Health (ODH), which was responsible for enforcement of state laws and was an agent of the Centers for Medicare and Medicaid Services (CMS). Himes was Interim Director of ODH from February 21, 2014, until Hodges took over as Director of ODH on August 11, 2014.

The amended complaint asserted that, from March 2014 through September 2014, ODH personnel conducted survey inspections of plaintiffs' facility and issued citations that misrepresented facts and exaggerated the seriousness and extent of the violations being reported. Then, based on those citations, Himes and Hodges allegedly treated plaintiffs' facility less favorably than similarly situated white-owned facilities because Mrs. Calloway is an African American. The amended complaint asserted that Himes and Hodges did so by subjecting plaintiffs' facility to greater scrutiny and giving it less time to correct deficiencies in order to: (1) revoke its license and (2) cause CMS to terminate the facility's participation in the Medicare/Medicaid Programs. Plaintiffs sought $2.65 million in damages from the defendants, personally, arising from the closure of the facility and the inability to transfer the facility's operating rights due to the license revocation proceedings.

In evaluating the defendants' motion to dismiss, the district court considered the factual allegations in the amended complaint together with the documents that the defendants attached to their motion. Those documents included: three notices of proposed license revocation sent by either Himes or Hodges; the ODH Hearing Officer's Report and Recommendation (R&R); and the order signed by Hodges adopting the R&R and revoking the facility's license. Defendants also attached two notices sent to plaintiffs' facility by CMS, imposing immediate remedies and

ultimately ending the facility's participation in the Medicare/Medicaid Programs. There is no dispute on appeal that the district court properly considered those documents, which were referred to in the amended complaint, were central to plaintiffs' claims, and are public records of state and federal administrative agencies. *See Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997). Like the district court, we only consider the documents in assessing "the nature of the administrative proceedings described in the complaint and the defendants' function in those proceedings." *Bon-Ing, Inc. v. Hodges*, No. 2:16-cv-710, 2016 WL 6680813, at *3 (S.D. Ohio Nov. 14, 2016).

Briefly, it is apparent that the surveys were conducted by ODH personnel other than the defendants and began with a complaint investigation survey conducted on March 14, 2014. That survey identified multiple violations and made a finding of "real and present danger" to residents (in the nature of unabated resident-on-resident physical abuse). Interim Director Himes recommended to CMS that it impose immediate remedies based on those survey results, which CMS did in a notice dated April 15, 2014. After two more complaint surveys and an annual survey revealed new and uncorrected prior violations, CMS sent a second notice on July 15, 2014, imposing additional penalties and advising that plaintiffs' facility would be terminated from the Medicare/Medicaid Programs. Plaintiffs did not request a hearing, and alleged that the loss of those reimbursements forced the facility to close on or about September 14, 2014.

Interim Director Himes initiated the license revocation proceedings by way of the first notice dated July 30, 2014. He rescinded that notice and issued a new notice of proposed revocation on August 8, 2014, which supplemented the grounds with the results of another complaint investigation survey that included a second finding of "real and present danger." Director Hodges subsequently rescinded that notice and issued a new notice of proposed license

revocation on September 26, 2014, which added further reliance on an August 13 follow-up survey that included a third finding of "real and present danger." Plaintiffs requested a hearing, and a hearing officer conducted an evidentiary hearing over several days during April and May 2015. A written Report and Recommendation setting forth factual findings and conclusions of law was issued on February 8, 2016. On March 24, 2016, Director Hodges signed the Adjudication Order adopting the recommendation of the hearing officer, revoking the facility's license and advising plaintiffs of their right to appeal. Plaintiffs did not appeal, but commenced this § 1983 action in August 2016.

Defendants moved to dismiss plaintiffs' claims on a number of grounds—including absolute immunity, qualified immunity, statute of limitations, and failure to state a claim. Addressing only the defense of absolute immunity, the district court granted defendants' motion for reasons fully and ably set forth in its opinion and order entered on November 14, 2016. This appeal followed.

## II.

We review de novo the district court's dismissal of the plaintiffs' claims under Rule 12(b)(6). *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017). We must accept the plaintiffs' factual allegations as true and construe the complaint in the light most favorable to plaintiffs, but we are "not required to accept legal conclusions or unwarranted factual inferences as true." *Id*. A motion to dismiss will be granted "if the claim shows on its face that relief is barred by an affirmative defense." *Riverview Health Inst., LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). It is the defendants who bear the burden of establishing entitlement to the defense of absolute immunity. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 (1993).

As the district court explained, the protections of absolute quasi-judicial and quasi-prosecutorial immunity extend to administrative agency officials. *See Butz v. Economou*, 438 U.S. 478, 513-16 (1978). The Supreme Court has held that persons "performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts." *Id*. at 514. In addition, agency officials "who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision." *Id*. at 516. Significantly, it is not the identity of the actor, but the nature of the function performed that determines whether an official is entitled to absolute immunity. *See Forrester v. White*, 484 U.S. 219, 229 (1998).

In *Watts v. Burkhart*, this court found quasi-judicial immunity barred the claims brought by an African-American physician against members of the Tennessee Board of Medical Examiners alleging a denial of equal protection in connection with the revocation of his medical license. 978 F.2d 269, 271-72 (6th Cir. 1992) (en banc) (alleging that he was treated differently than similarly situated non-minority physicians). Following the lead of *Watts*, the district court recognized that it must determine whether the agency official: (1) performed a traditional prosecutorial or adjudicatory function; (2) initiated or decided cases sufficiently controversial that, in the absence of immunity, he would be subject to numerous damages actions; and (3) prosecuted or adjudicated disputes against a backdrop of safeguards designed to protect the plaintiffs' constitutional rights. *Bon-Ing*, 2016 WL 6680813, at *4 (citing *Williams v. Michigan Bd. of Dentistry*, 39 F. App'x 147, 148-49 (6th Cir. 2002), and *Quatkemeyer v. Kentucky Bd. of Med. Licensure*, 506 F App'x 342, 346-49 (6th Cir. 2012)). The district court found all three factors were met here.

Plaintiffs' appeal focuses primarily on the first factor. The district court analyzed the defendants' actions relating to the license revocation separately from the recommendations to CMS. With respect to the license revocation, there is no dispute that the director of ODH has the authority to enforce state laws governing skilled nursing facilities. That discretionary authority includes deciding whether a violation warrants issuance of a revocation notice and making the final administrative decision. *See Bon-Ing*, 2016 WL 6680813, at \*5 (citing Ohio Rev Code §§ 3721.03(B) and 119.09).

Accepting plaintiffs' allegations as true, Himes and Hodges exercised their discretion in deciding to issue the successive notices of proposed license revocation without giving plaintiffs additional time to correct the deficiencies. In addition, once plaintiffs requested a hearing, Hodges reviewed the hearing officer's findings and issued the order revoking the license for plaintiffs' facility. Notwithstanding plaintiffs' assertions, it is immaterial that the defendants were neither the hearing officer nor the attorney representing the agency during those proceedings. We agree with the district court's careful analysis and conclude that the defendants' challenged actions leading to the revocation of plaintiffs' license were prosecutorial or adjudicatory in nature.

As for the recommendations made to CMS, the district court properly recognized that this claim could only pertain to Himes since CMS acted to terminate plaintiffs' participation in the Medicare/Medicaid Programs before Hodges became the Director of ODH. Plaintiffs alleged that Himes made recommendations that caused CMS to place the facility on the Special Focus Facility list (SFF), impose substantial civil money penalties, and terminate plaintiffs' facility from the Medicare/Medicaid Programs. Those recommendations were allegedly "made in bad faith with improper (racial) motives and [] were based on unfounded, false and misleading so

called conclusions regarding Plaintiffs' alleged non-compliance with the applicable laws, rules and regulations." The district court concluded that "Himes performed a prosecutorial function by considering the survey results to determine if there had been a violation of statutory and regulatory standards before making a recommendation to CMS." *Bon-Ing*, 2016 WL 6680813, at * 7. We agree.

Addressing the second factor, the district court aptly observed that both the licensing of skilled nursing facilities and their eligibility to receive Medicare/Medicaid payments are areas that have the potential to subject a director of the ODH to numerous actions for damages. *Id*. at *5 and *7. The district court observed that the financial stakes in this area are illustrated by plaintiffs' own suit, which sought $2.65 million in damages and alleged that the facility was forced to close by the loss of Medicare/Medicaid reimbursements and that plaintiffs were unable to sell the facility's operating rights due to the license revocation. Because plaintiffs do not challenge the district court's determination with respect to this factor, we do not discuss it further except to say that the possibility of damages suits in the absence of immunity is obvious.

Finally, absolute immunity would not be available if the defendants' actions "were not subject to restraints and safeguards comparable to those built into the archetypal judicial process." *Watts*, 978 F.2d at 275. As outlined by the district court, the director of ODH may issue an order revoking a facility's license only after providing a hearing or an opportunity to be heard pursuant to Chapter 119 of the Ohio Revised Code, which confers procedural protections and the right to judicial review in the court of common pleas. *Bon-Ing*, 2016 WL 6680813, at *6; *see also Wilde v. Ohio Veterinary Med. Licensing*, 31 F. App'x 164, 165 (6th Cir. 2002) (noting that Ohio Rev. Code § 119.12 permits the state court to consider constitutional claims). Similarly, there is no dispute that CMS provided plaintiffs with an opportunity for a hearing

before an administrative law judge with procedural safeguards subject to administrative appeal to the Department Appeals Board and judicial review of the Board's decision. *See* 42 C.F.R. §§ 498.3(a)(2)(i), 498.4, 498.40; *Claiborne-Hughes Health Ctr. v. Sebelius*, 609 F.3d 839, 843-44 (6th Cir. 2010). Plaintiffs offer no authority or developed argument challenging the district court's conclusions with respect to this factor.

Because the district court did not err in dismissing plaintiffs' claims against Himes and Hodges on the grounds of absolute immunity, the judgment is **AFFIRMED**.