RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JEFFREY HUGHES,

               *Plaintiff-Appellant*,

    *v.*

ZANE DUNCAN; GARY M. FAULCON; TIM GOBBLE;
MAE BEAVERS; ROBERTA NEVIL KUSTOFF; BARRETT
RICH,

               *Defendants-Appellees*.

No. 22-6004

─────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00238—Waverly D. Crenshaw, Jr., District Judge.

Argued:  July 27, 2023

Decided and Filed:  February 15, 2024

Before:  GIBBONS, READLER, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:**  Melissa K. Dix, HORWITZ LAW, PLLC, Nashville, Tennessee, for Appellant.
Dean S. Atyia, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee,
for Appellees.  **ON BRIEF:**  Melissa K. Dix, Daniel A. Horwitz, Lindsay E. Smith, HORWITZ
LAW, PLLC, Nashville, Tennessee, for Appellant.  Dean S. Atyia, Cody N. Brandon, OFFICE
OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

─────────────

## OPINION

─────────────

CHAD A. READLER, Circuit Judge.  Jeffrey Hughes was incarcerated in Tennessee
state prison.  Believing that a recent change in state law entitled him to an earlier-than-scheduled

parole hearing, he asked the Tennessee Board of Parole to move up his hearing date. The Board refused. In the end, Hughes was paroled about three months after the date he believed he became eligible for release. That delay prompted Hughes to file a federal lawsuit against the members of the Board, alleging overincarceration. The district court dismissed the case on the ground that defendants were absolutely immune from suit for their acts. We agree and affirm.

I.

Jeffrey Hughes was sentenced to a 27-year term of imprisonment in Tennessee. Tennessee law afforded him the opportunity to be released on parole before he served his entire sentence, beginning on a statutory "release eligibility date." Tenn. Code Ann. § 40-35-501(a)(1) (West 2024). For Hughes, that day was September 30, 2021. More than a year before that date, the Tennessee Board of Parole held an initial parole hearing for Hughes. At the hearing's close, the Board denied Hughes parole, and set a second hearing for July 2022.

After the parole denial, the Tennessee Legislature enacted the Reentry Success Act, which altered the Volunteer State's parole law. 2021 Tenn. Pub. Acts ch. 410, § 12 (codified as amended at Tenn. Code Ann. § 40-35-503(i)(1) (West 2024)). Through the Act, Tennessee established (with certain exceptions) a "presumption that an eligible inmate must be released on parole" upon the release eligibility date "or any subsequent parole hearing." Tenn. Code Ann. § 40-35-503(i)(1) (West 2024). Hughes read the Act's presumption of release to apply to him. So he wrote the Board to request that it either release him or move up the date of his second parole hearing. The Board rebuffed his request on two grounds. One, as a legal matter, the Board did not understand the Act to apply retroactively to prior parole denials. Second, as a practical matter, the Board believed it lacked the "ability or resources necessary" to reschedule hearings for Tennessee inmates who had already had unsuccessful parole hearings.

Undeterred, Hughes sought review of the Board's decision through a writ of certiorari in state chancery court. His efforts were rewarded when the chancery court sided with Hughes. It held that Tennessee law entitled Hughes to a second parole hearing "within a reasonable time of [his] release eligibility date." To effectuate that right, the court ordered the Board to set a parole hearing within 60 days of his eligibility date. The Board complied, holding a hearing in

November 2021.  Finding Hughes eligible for parole, the Board ordered his release.  A month later, Hughes exited prison.

A free man, Hughes filed this suit against six defendants, all members of the Board when Hughes unsuccessfully petitioned for release.  Invoking 42 U.S.C. § 1983, Hughes's complaint alleged that defendants violated his procedural due process rights by depriving him of a protected liberty interest in parole without a timely hearing.  The district court concluded that defendants were entitled to absolute immunity, and thus dismissed the complaint.  Hughes filed a timely appeal.

II.

The district court dismissed Hughes's case on absolute immunity grounds, an issue we review de novo.  *Rieves v. Town of Smyrna, Tenn.*, 95 F.3d 678, 690 (6th Cir. 2020).  In turning to that issue, we highlight an underlying legal principle:  judicial immunity.  Federal common law has long afforded judges absolute immunity from suits for money damages arising out of actions taken in a judge's official judicial capacity.  *Morgan v. Bd. of Prof. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023).  Originating in the Middle Ages, this body of law developed as a means to discourage collateral attacks on judicial decisions and to protect judges from vexatious litigation.  *Forrester v. White*, 484 U.S. 219, 225 (1988).

From this settled body of law, today's case presents a wrinkle, as Hughes does not challenge a decision made by judges.  Rather, he challenges actions by state parole board members.  But the judicial immunity principle remains salient, as this manner of immunity has been extended to executive officials whose adjudicatory duties resemble those of a judge.  *See Butz v. Economou*, 438 U.S. 478, 513–14 (1978).  The common law adapted in this way out of a recognition that those performing judicial functions, regardless of their specific titles, require special protection from "harassment [and] intimidation."  *Id*. at 512.  For these reasons, courts grant absolute immunity to officials whose duties are functionally comparable to those of a judge.  *See Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976) ("It is the functional comparability of their judgments to those of the judge that has resulted in both grand jurors and prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed

'quasi-judicial' as well."). Examples are plentiful. *See, e.g.*, *Yaselli v. Goff*, 275 U.S. 503 (1927), *aff'g* 12 F.2d 396 (2d Cir. 1926) (applying absolute immunity to public prosecutors under the common law); *Butz*, 438 U.S. at 514 (extending absolute immunity to executive administrative law judges); *Foster v. Walsh*, 864 F.2d 416, 418 (6th Cir. 1988) (concluding that a clerk issuing an arrest warrant was performing a judicial act to which absolute immunity attached); *Watts v. Burkhart*, 978 F.2d 269, 278 (6th Cir. 1992) (en banc) (granting absolute immunity to members of a state board of medical examiners); *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (extending absolute immunity to an official performing an "integral part[] of the judicial function" by carrying out a court order); *Bon-Ing, Inc. v. Hodges*, 700 F. App'x 461, 464–65 (6th Cir. 2017) (granting immunity to Ohio Department of Health employees in an "adjudicatory" role).

*Butz* articulates two considerations that inform whether an executive employee performs an adjudicatory function deserving of absolute immunity. 438 U.S. at 513–14. One, are the employee's powers "comparable" to those of a judge? *Id*. at 513. Two, are there safeguards that "tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct?" *Id*. at 512. Examples include "[t]he insulation of the [individual] from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal." *Id*.; *see also Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (summarizing the *Butz* factors and describing them as non-exhaustive). We examine those same issues here, in the context of decisionmaking by the Parole Board.

A. Reflecting on the Board's responsibilities and procedures, myriad factors support the conclusion that its members are absolutely immune from damages suits challenging its decision on when to hold a parole hearing. Initially, we note that the Board, in deciding parole eligibility, functions "in a quasi-judicial capacity." *Sellars v. Procunier*, 641 F.2d 1295, 1301 n.15 (9th Cir. 1981) (quoting *Bricker v. Mich. Parole Bd.*, 405 F. Supp. 1340, 1345 (E.D. Mich. 1975)); *see also Hilliard v. Williams*, 465 F.2d 1212, 1217 (6th Cir. 1972) ("The immunity of quasi-judicial officers such as prosecuting attorneys and parole board members derives, not from their formal association with the judicial process, but from the fact that they exercise a discretion similar to that exercised by judges." (quoting *McCray v. State of Maryland*, 456 F.2d 1, 3 (4th Cir. 1972))).

In making decisions to grant, deny, or revoke parole, the Board in effect acts as "an arm of the sentencing judge." *Sellars*, 641 F.2d at 1301 n.15; *Peoples v. Leon*, 63 F.4th 132, 138–39 (2d Cir. 2023); *Tobey v. Chibucos*, 890 F.3d 634, 650 (7th Cir. 2018); *Cheatham v. Muse*, 617 F. App'x 252, 254 (4th Cir. 2015) (per curiam); *Figg v. Russell*, 433 F.3d 593, 598 (8th Cir. 2006); *Johnson v. R.I. Parole Bd. Members*, 815 F.2d 5, 8 (1st Cir. 1987) (per curiam). Like judges, board members make parole determinations with an eye towards both prisoner rehabilitation and protecting society at large. *Sellars*, 641 F.2d at 1301 n.15 (quoting *Bricker*, 405 F. Supp. at 1345)).

Hughes's case presents a variation on this theme. He, by and large, does not challenge an ultimate parole determination, as that manner of decision is plainly subject to judicial immunity. Rather Hughes's focus is on defendants' decision not to reschedule his hearing date to occur in advance of his release eligibility date. Whether absolute immunity applies in that setting is assessed on a "functional" basis—individuals are entitled to immunity for actions taken in the course of judicial proceedings, but not for those that are merely administrative in nature. *Bush*, 38 F.3d at 847. That begs the question: are the Board's scheduling decisions adjudicatory? We think so. Borrowing from the judicial immunity test, to determine whether a specific act by an adjudicator is covered, we make two inquiries. One, is the function "normally performed by a judge?" *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007) (quoting *DePiero v. City of Macedonia*, 180 F.3d 770, 784 (6th Cir. 1999)). That is the case here—trial judges schedule hearings nearly every day. *See Mann v. Conlin*, 22 F.3d 100, 104 (6th Cir. 1994) (scheduling decisions are "paradigmatic judicial acts"). Two, did the party deal with the adjudicator(s) in their "judicial capacity"? *Dixon*, 492 F.3d at 674 (citation omitted). Here again, the answer is yes. *See Tillman v. Price*, 113 F.3d 1236 (6th Cir. 1997) (order) (unpublished table decision) (affirming grant of immunity for a parole board member's scheduling decision). As any litigant might, Hughes requested a particular hearing date and was refused.

Equally true, sufficient safeguards exist to protect prisoners' constitutional rights with respect to parole determinations. *See Butz*, 438 U.S. at 512. The Board is comprised of seven members serving six-year terms. Tenn. Code Ann. § 40-28-103(a)–(b) (West 2024). Although the members are appointed by the governor, the Board is "autonomous in structure," and is a

separate entity from the prison system and the governor's office. § 40-28-103(a) ("In all respects the board shall be separate functionally and administratively from any other agency."). In this regard, it is notably different from the prison discipline committee in *Cleavinger*, whose members were "direct subordinates of the warden who reviews their decision" and, therefore, did not serve a traditional adjudicatory function. 474 U.S. at 203–04; *see also Quatkemeyer v. Ky. Bd. of Med. Licensure*, 506 F. App'x 342, 347 (6th Cir. 2012) (noting favorably a medical board's composition "of independent professionals who[] were not direct subordinates of the person or entity that appoints them"). The Board also has the authority to take testimony, to compel the presence of witnesses and the production of documents, and to appoint legal counsel for the indigent. § 40-28-106(a)(1)–(2), (b)(1). Because these adversarial features of the Board's hearing process "tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error." *Butz*, 438 U.S. at 512. Reinforcing the chance that errors of constitutional magnitude will be remedied is the fact that state law requires an internal appeal be made available to inmates whose requests for parole are denied. § 40-28-105(d)(11). On top of that, state courts are available to provide limited review of the Board's decisions through writs of certiorari, much as the chancery court did in this case. *See Phifer v. Tenn. Bd. of Parole*, No. M2000-01509-COA-R3-CV, 2002 WL 31443204, at *3 (Tenn. Ct. App. Nov. 1, 2002); *see also Bon-Ing*, 700 F. App'x at 465–66 (holding that sufficient safeguards exist in the form of "procedural protections," "judicial review" in state court, and "administrative appeal"). Each of these review mechanisms puts in place a considerable check on the possibility for unconstitutional behavior by the Board. And these safeguards are equivalent to those we have recognized as sufficient to justify absolute immunity in prior cases. *Bon-Ing*, 700 F. App'x at 465–66; *Quatkemeyer*, 506 F. App'x at 347–48.

That immunity should extend in this circumstance is further confirmed by the fact that a parole board member's functions give rise to the potential for vexatious lawsuits, another characteristic shared with judges. *Butz*, 438 U.S. at 512–13. During the most recent year for which an annual report is available, the Board held 700 hearings. Bd. of Parole, State of Tennessee, 2022–23 Annual Report 8 (Oct. 2023) (available at https://perma.cc/AJ59-NCMX). The report does not indicate how many of those resulted in parole denials. But one can safely

assume that the volume of lawsuits related to the timing of those hearings would be a considerable distraction from the Board's work, were those decisions subject to a damages action. Look no further than Hughes's complaint, which seeks "not less than $1 million." It would not take many filings of that ilk to cross into "vexatious" territory, forcing Board members to weigh those consequences in reaching parole decisions.

All in all, the *Butz* factors, and more, weigh in favor of affording judicial immunity to defendants. That conclusion is consistent with a string of unpublished dispositions in which we have conferred immunity on parole board members in making decisions on parole eligibility. *E.g.*, *Wortman v. Bd. of Parole*, No. 20-5718, 2021 WL 9528123, at *3 (6th Cir. 2021) (order); *Horton v. Martin*, 137 F. App'x 773, 775 (6th Cir. 2005) (order) ("Parole board members are absolutely immune from liability for their conduct in individual parole decisions when they are exercising their decision making powers.") (quotation omitted); *Hawkins v. Morse*, 194 F.3d 1312 (6th Cir. 1999) (order) (unpublished table decision); *Ward v. Moss*, 42 F.3d 1390 (6th Cir. 1994) (order) (unpublished table decision). Today, we join two of our sister circuits in extending that immunity to scheduling decisions specifically. *Fort v. Washington*, 41 F.4th 1141, 1145–47 (9th Cir. 2022) (scheduling a parole board hearing is "part and parcel of the decision process" and "inexorably connected with a judicial function" (cleaned up)); *Thompson v. Duke*, 882 F.2d 1180, 1184 (7th Cir. 1989) ("[T]he state defendants clearly had a duty to schedule and conduct a parole violation hearing. Such activity, while perhaps routine in many cases, is obviously an integral judicial (or quasi-judicial) function subject to absolute immunity.").

B.1. Hughes casts defendants' action in a different light. To his mind, the Board's error in effect was a failure to honor his right to be granted parole. This reframing, however, does not change our conclusion. All parties seem to agree that even with the Act's presumption of parole, the Board still must analyze each of the statutory factors bearing on parole before granting it— sometimes after an in-person hearing, sometimes not. In essence, then, Hughes challenges the Board's timing in performing that analysis. That is not enough to overcome immunity. Consider the analogous judicial setting, where a judge enjoys immunity for the "paradigmatic" judicial act of scheduling a hearing. *Mann*, 22 F.3d at 104. The same judge would likewise be immune from a suit for the time it takes to decide a pending motion. So too, we conclude, for defendants.

Resisting this conclusion, Hughes paints the failure to schedule a hearing as a purported "non-judicial function[]," to which immunity would not attach.  Unlike judicial functions such as "hearing evidence, weighing conflicting testimony, and exercising judgment and discretion based on the evidence received," Hughes says, the Board's scheduling decision was an "administrative function" that required neither "adjudication" nor "discretion."

We remain unconvinced.  To start, the dividing lines here are not as bright as Hughes suggests.  Acts may be judicial even if they require little to no discretion.  With respect to scheduling a hearing in particular matters, other circuits agree that even if that task "may be characterized by some as 'mechanical or routine,' the fact that scheduling a hearing is an 'integral judicial . . . function' places it within the realm of activities protected by quasi-judicial immunity."  *Fort*, 41 F.4th at 1146 (cleaned up); *Thompson*, 882 F.2d at 1184 ("In the judicial context, scheduling a case for hearing is part of the routine procedure in any litigated matter. However, the fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function.").  We are of the same mind.  Setting case schedules and the like are part and parcel of a judge's duty in guiding a dispute to resolution.  And even if some amount of discretion were required to qualify an act as a judicial function, today's case is one in which the Board clearly exercised discretionary judgment.  In the chancellor's words, the Reentry Success Act worked a "sea change in how parole matters are to be handled in Tennessee."  Faced with analyzing and applying a novel statute, the Board exercised its interpretive discretion, ultimately concluding that the Act did not apply retroactively.  That act of legal interpretation is as judicial of an activity as they come.

2.  Switching gears, Hughes contends that defendants should be precluded from arguing for absolute immunity.  Pointing back to the chancery court litigation, Hughes contends that both judicial estoppel and res judicata stand in the way of us considering whether to afford immunity to defendants.  The district court disagreed in both respects.  We see no error in those conclusions.

Take judicial estoppel first, an issue we review de novo.  *See Stanley v. FCA US, LLC*, 51 F.4th 215, 218 (6th Cir. 2022).  That doctrine precludes defendants' arguments here if they took "two 'clearly inconsistent' positions at different times," to Hughes's "unfair detriment."  *Tarrify*

*Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1110 (6th Cir. 2022) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)).  Hughes fails from the start, as he cannot show that the Board's positions in chancery court were inconsistent with those its members take now.  Consider, for example, the Board's representation in the state proceeding that it had made "no adjudicatory" parole decision reviewable under a writ of certiorari, the procedural vehicle through which Hughes brought his state suit.  *See Phifer*, 2002 WL 31443204, at *3 ("Persons dissatisfied with the Board's decisions may obtain judicial review using a petition for common law writ of certiorari.").  Hughes believes that claim is inconsistent with defendants' assertions today that their scheduling decision was judicial in nature.  But an act falling short of a "parole decision" may still be "judicial" for immunity purposes under federal law.  At bottom, the Board's prior argument was about ripeness; in stating that "no adjudicatory hearing was held," the Board meant that the chancellor lacked jurisdiction over Hughes's petition because the Board had not issued a parole decision.  In contrast, defendants' claim of "judicial" action here concerns not its reviewability under a common law writ of certiorari, but the similarity between their acts and a judge's functions.

The same can be said of the Board's statement that it took the challenged scheduling action at an "administrative meeting."  Hughes characterizes this representation as inconsistent with defendants' present characterization of the scheduling decision as judicial.  True, in the judicial immunity context, we have sometimes made a distinction between judicial acts, which are immunity-eligible, and administrative acts, which are not.  *See Morgan*, 63 F.4th at 519.  But that dichotomy has no relevance here because immunity was not at issue in the chancery court.  Taking the record as a whole, the Board and its members were not even speaking the same language in the first suit and this one, much less saying clearly inconsistent things.

Next, consider res judicata.  As before, we review the district court's refusal to apply this state law doctrine de novo.  *Prods. Sols. Int'l, Inc. v. Aldez Containers, LLC*, 46 F.4th 454, 457 (6th Cir. 2022) (citation omitted) (standard of review); *West v. Parker*, 783 F. App'x 506, 511 (6th Cir. 2019) (state law issue).  According to Hughes, the chancery suit and the present suit each implicate the same legal claim, one that stems from the same facts.  As a result, he says, defendants should not be permitted here to relitigate "the administrative nature of their actions."

In district court, Hughes argued for (and the district court applied) the test for claim preclusion, which "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020) (quotation omitted); *see also Gerber v. Holcomb*, 219 S.W.3d 914, 918–19 (Tenn. Ct. App. 2006) (applying claim preclusion to an affirmative defense). Hughes maintains that framing on appeal.

Claim preclusion will not bar a party from asserting a defense in a second suit that "involves a new claim or cause of action." *Lucky Brand*, 140 S. Ct. at 1595 (quotation omitted); *see also Creech v. Addington*, 281 S.W.3d 363, 380–81 (Tenn. 2009) (applying an identical principle under Tennessee law). Whether the second suit so qualifies turns on the question whether the two claims share a "common nucleus of operative facts." *Lucky Brand*, 140 S. Ct. at 1595 (quotation omitted). Hughes believes that is true here, as both suits stem from the Board's scheduling decision. Yet that approach overlooks the antecedent requirement that the relevant defense, in this case, immunity, must have been available to defendants. *Id.* at 1594. And as defendants could not have raised their immunity defense in a state suit offering limited review of the Board's decision, it is not barred here. *See Hall v. McLesky*, 83 S.W.3d 752, 757 (Tenn. Ct. App. 2001) ("[T]he scope of review under the common law writ of certiorari is very narrow. It does not involve an inquiry into the intrinsic correctness of the decision of the tribunal below, but only into the manner in which the decision was reached.").

At day's end, defendants are not precluded from raising their absolute immunity defense, and they do so successfully here.

\*     \*     \*     \*     \*

The district court's judgment is affirmed.